## No. 13-13800

_____

In the United States Court of Appeals
for the Eleventh Circuit

_____

THOMAS HAYDEN BARNES,

Plaintiff-Appellant,

v.

RONALD M. ZACCARI, individually and in his official capacity as President of
Valdosta State University; BOARD OF REGENTS OF THE UNIVERSITY
SYSTEM OF GEORGIA; KURT KEPPLER, individually and in his official
capacity as Vice President for Student Affairs at Valdosta State University;
RUSS MAST, individually and in his official capacity as Dean of Students
at Valdosta State University; LEAH MCMILLAN, individually and in her
official capacity as a counselor at Valdosta State University; and
LAVERNE GASKINS, individually and in her official capacity
as in-house counsel at Valdosta State University,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Middle District of Georgia, Valdosta Division

_____

## OPENING BRIEF OF APPELLANT

_____

Cary Wiggins
Georgia Bar #757657
Wiggins Law Group
260 Peachtree Street, N.W., Suite 401
Atlanta, Georgia 30303
(404) 659-2880

Robert Corn-Revere
Ronald G. London
Lisa Beth Zycherman
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006-3401
(202) 973-4200

Counsel for Appellant

Dated: December 9, 2013

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, counsel for the Appellant, Thomas Hayden Barnes, verify that the persons listed below have or may have an interest in the outcome of this case:

1.    Barnes, Thomas Hayden

2.    Board of Regents of the University System of Georgia

3.    Brannen Searcy & Smith, LLP

4.    Corn-Revere, Robert

5.    Daley Koster & LaVallee, LLC

6.    Davis Wright Tremaine LLP

7.    Gaskins, Laverne

8.    Georgia Department of Administrative Services

9.    Hance, Holly

10.    Keppler, Kurt

11.    Koster, Paul

12.    Lawson, Honorable Hugh:  District Court Judge for the United States District Court for the Middle District of Georgia, Valdosta Division

13.    LaVallee, Matthew R.

14.    London, Ronald G.

15.    Mast, Russ

16.    McMillan, Leah

17.    Morgan, Victor

18.    Pannell, Jr., Honorable Charles A.:  District Court Judge for the
       United States District Court for the Northern District of Georgia,
       Atlanta Division

19.    Royal-Will/David C. Will, P.C.

20.    Smith, David R.

21.    Valdosta State University

22.    Wiggins, Cary Stephen

23.    Wiggins Law Group

24.    Will, David C.

25.    Zaccari, Ronald M.

26.    Zycherman, Lisa Beth

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Eleventh Circuit Rule 28-1(c), Appellant requests oral argument. This appeal presents significant legal issues with public importance involving First Amendment rights and the award of attorney's fees, and reverse attorney's fees, in civil rights cases.  Oral argument would assist the court in addressing these issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CITATIONS ...................................................................................... vi

STATEMENT OF SUBJECT-MATTER AND APPELLATE
      JURISDICTION ...............................................................................1

STATEMENT OF THE ISSUES..............................................................................2

STATEMENT OF THE CASE..................................................................................2

    A.    FACTUAL BACKGROUND ........................................................2

        1.    Zaccari's Reaction to Barnes' Speech ........................3

        2.    Zaccari Involved Others in His Plan to Expel Barnes ...............7

        3.    Barnes' Appeal of the Withdrawal ...........................12

    B.    ALLEGATIONS IN THE COMPLAINT...........................................13

    C.    PROCEEDINGS BELOW ..........................................................14

        1.    Decision on Motions to Dismiss................................14

        2.    Decision on Cross-Motions for Summary Judgment................14

        3.    Interlocutory Appeal ..................................................15

        4.    Trial on Damages ......................................................16

        5.    District Court Decision on Fees.................................16

STANDARD OF REVIEW .....................................................................................17

SUMMARY OF THE ARGUMENT .....................................................................19

ARGUMENT ..........................................................................................................20

I.    THE DISTRICT COURT ERRED BY GRANTING SUMMARY
    JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT
    RETALIATION CLAIM ..............................................................20

    A.    Barnes' Expulsion is a Classic Case of Unconstitutional
        Retaliation .......................................................................20

    B.    The District Court Erroneously Decided Summary Judgment
        Because it Misread the Complaint ......................................26

    C.    The District Court's Decision is Erroneous Even if the
        Complaint Could Be Read as Alleging Only a Conspiracy ...............31

iv

D.  The District Court Must Be Directed to Award Appropriate
    Relief on the Retaliation Claim ............................................................35

II.  THE DISTRICT COURT ERRED BY GRANTING DEFENDANTS
     REVERSE ATTORNEY'S FEES ................................................................36

A.  Granting Reverse Fees Thwarts the Purpose of the Civil Rights
    Attorneys Fee Awards Act ....................................................................38

B.  Plaintiff's Claims Against Prevailing Defendants Were Far
    From Frivolous ......................................................................................40

C.  The District Court Awarded Excessive Fees .......................................46

III. THE DISTRICT COURT ERRED BY REFUSING TO GRANT
     COMPENSATORY ATTORNEY FEES SOUGHT BY PLAINTIFF .........48

A.  Plaintiff Filed a Fully Supported Fee Petition ....................................48

B.  The District Court Erroneously Discounted Plaintiff's Fee
    Award .....................................................................................................51

    1.  The Across-the-Board Fee Reduction is Excessive and
        Ignores to Public Benefit of the Judgment ...............................51

    2.  The District Court Applied the Wrong Hourly Rate ................54

CONCLUSION ......................................................................................................56

# TABLE OF CITATIONS

**Page(s)**

**Federal Cases**

*American Dental Ass'n v. Cigna Corp.*,
　605 F.3d 1283 (11th Cir. 2010) .........................................................32

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)..........................................................................30

*Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*,
　442 F.3d 1283 (11th Cir. 2006) .......................................48, 49, 52, 53

*Barnes v. Zaccari*,
　669 F.3d 1295 (11th Cir. 2012) ........................................2, 15, 31, 43

*Bart v. Telford*,
　677 F.2d 622 (7th Cir. 1982) ............................................................24

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)..........................................................................30

*Bendiburg v. Dempsey*,
　909 F.2d 463 (11th Cir. 1990) .....................................................31, 32

*Bennett v. Hendrix*,
　423 F.3d 1247 (11th Cir. 2005) ...............................................20, 21, 23

*Bivins v. Wrap it Up, Inc.*,
　548 F.3d 1348 (11th Cir. 2008) ...................................................51, 55

*Blanchard v. Bergeron*,
　489 U.S. 87 (1989)............................................................................53

*Bloch v. Ribar*,
　156 F.3d 673 (6th Cir. 1998) ............................................................25

*Bose Corp. v. Consumers Union*,
　466 U.S. 485 (1984)..........................................................................18

*Burrell v. Board of Trs. of Ga. Military Coll.*,
　970 F.2d 785 (11th Cir. 1992) .................................................27, 31, 32

*Busby v. City of Orlando*,
   931 F.2d 764 (11th Cir. 1991) ....................................................................43, 44

*Cate v. Oldham*,
   707 F.2d 1176 (11th Cir. 1983) ..........................................................................20

*Christiansburg Garment Co. v. EEOC*,
   434 U.S. 412 (1978)............................................................................................39

*Cohen v. World Omni Fin. Corp.*,
   457 F. App'x 822 (11th Cir. 2012) .....................................................................44

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ...................................................................21, 23, 24

*Cordoba v. Dillard's, Inc.*,
   419 F.3d 1169 (11th Cir. 2005) ...............................................................18, 41, 44

*Crowe v. Lucas*,
   595 F.2d 985 (5th Cir. 1979) ..............................................................................32

*Dixon v. Brown*,
   38 F.3d 379 (8th Cir. 1994) ................................................................................25

*Duke v. Massey*,
   87 F.3d 1226 (11th Cir. 1996) ............................................................................17

*Dussouy v. Gulf Coast Inv. Corp.*,
   660 F.2d 594 (5th Cir. 1981) ..............................................................................29

*Edwards v. South Carolina*,
   372 U.S. 229 (1963)............................................................................................21

*Eiland v. City of Montgomery*,
   797 F.2d 953 (11th Cir. 1986) ............................................................................22

*Evans v. McClain of Georgia, Inc.*,
   131 F.3d 957 (11th Cir. 1997) ......................................................................29, 30

*Flannigan's Enters., Inc. v. Fulton Cnty.*,
   596 F.3d 1265 (11th Cir. 2010) ..........................................................................18

*Forsyth v. Kleindienst*,
   599 F.2d 1203 (3d Cir. 1979) ............................................................................33

*Fox v. Vice*,
   131 S. Ct. 2205 (2011).................................................................38, 39, 45, 46

*Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*,
   678 F.3d 1199 (11th Cir. 2012) .........................................................................47

*Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*,
   856 F.2d 142 (11th Cir. 1988) ..........................................................................20

*Goss v. Lopez*,
   419 U.S. 565 (1975)..........................................................................................23

*Hamilton v. Allen-Bradley Co.*,
   224 F.3d 819 (11th Cir. 2001) ..........................................................................29

*Hart v. Bourque*,
   798 F.2d 519 (1st Cir. 1986)..............................................................................48

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)...................................................................38, 49, 50, 51

*Holloman ex rel. Holloman v. Harland*,
   370 F.3d 1252 (11th Cir. 2004) .........................................................................23

*Hughes v. Rowe*,
   449 U.S. 5 (1980) (*per curiam*) ........................................................................44

*Jones v. Texas Tech Univ.*,
   656 F.2d 1137 (5th Cir. 1981) ..........................................................................41

*Keene v. Prine*,
   477 F. App'x 575 (11th Cir. 2012)....................................................................29

*Keeton v. Anderson-Wiley*,
   664 F.3d 865 (11th Cir. 2011) ..........................................................................21

*Keyes v. Lauga*,
   635 F.2d 330 (5th Cir. 1981) .......................................................................38, 39

*Mangieri v. DCH Healthcare Auth.*,
  304 F.3d 1072 (11th Cir. 2002) ..........................................................................20

*Morris v. Crow*,
  117 F.3d 449 (11th Cir. 1997) ............................................................................17

*Moton v. Cowart*,
  631 F.3d 1337 (11th Cir. 2011) ..........................................................................20

*NAACP v. City of Evergreen*,
  812 F.2d 1332 (11th Cir. 1987) ..........................................................................55

*Ortiz v. Jordan*,
  131 S. Ct. 884 (2011)..........................................................................................35

*Popham v. City of Kennesaw*,
  820 F.2d 1570 (11th 1987) ..................................................................................53

*Putman v. Gerloff*,
  639 F.2d 415 (8th Cir. 1981) ..............................................................................33

*Resnick v. AvMed, Inc.*,
  693 F.3d 1317 (11th Cir. 2012) ..........................................................................29

*Sams v. United Food & Commercial Workers Int'l Union*,
  866 F.2d 1380 (11th Cir. 1989) ..........................................................................29

*Singer v. Fulton Cnty. Sheriff*,
  63 F.3d 110 (2d Cir. 1995) ..................................................................................20

*St. Paul Mercury Ins. Co. v. Williamson*,
  224 F.3d 425 (5th Cir. 2000) ..............................................................................29

*Steger v. General Elec. Co.*,
  318 F.3d 1066 (11th Cir. 2003) ..........................................................................29

*Sullivan v. School Bd. of Pinellas Cnty.*,
  773 F.2d 1182 (11th Cir. 1985) ......................................................41, 43, 44, 45

*Thaddeus-X v. Blatter*,
  175 F.3d 378 (11th Cir. 1999) (*per curiam*)......................................................25

*Thompson v. Pharmacy Corp. of Am., Inc.*,
    334 F.3d 1242 (11th Cir. 2003) ...........................................................................18

*United States v. Alaboud*,
    347 F.3d 1293 (11th Cir. 2003) ..........................................................................22

*United States v. Briggs*,
    514 F.2d 794 (5th Cir. 1975) ...............................................................................33

*United States v. Little*,
    2012 WL 566805 (W.D. La. 2012)......................................................................34

*Villano v. City of Boynton Beach*,
    254 F.3d 1302 (11th Cir. 2001) ...................................................................53, 54

*Wenzel v. Boyles Galvanizing Co.*,
    920 F.2d 778 (11th Cir. 1991) .............................................................................18

*Wigfall v. Sodexo, Inc.*,
    2013 WL 5302684 (11th Cir. Sept. 23, 2013) .............................................39, 44

*Williams v. Thomas*,
    692 F.2d 1032 (5th Cir. 1982) .............................................................................53

*Wood v. Holiday Inns, Inc.*,
    508 F.2d 167 (5th Cir. 1975) ...............................................................................30

*Zwick v. Regents of Univ. of Mich.*,
    2008 WL 1902031 (E.D. Mich. Apr. 28, 2008) .................................................23

**Constitutional Provisions**

U.S. Const., amend. I ......................................................................................*passim*

U.S. Const., amend. XI ...............................................................................14, 16

U.S. Const., amend. XIV ...........................................................................13, 14

**Federal Statutes**

20 U.S.C. § 1232g.............................................................................................12, 41

29 U.S.C. § 794...................................................................................................14

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1343(a)(3) & (4) ................................................................1

28 U.S.C. § 2201 ...................................................................................1

28 U.S.C. § 2202 ...................................................................................1

42 U.S.C. § 1983 ...........................................................................*passim*

42 U.S.C. § 1985 .................................................................................28

42 U.S.C. § 1988 ...........................................................................*passim*

42 U.S.C. §§ 12131 *et seq.* ...............................................................14

Civil Rights Attorney's Fees Awards Act of 1976 ...............................38

**Rules**

Fed. R. Civ. P. 8(a) .............................................................................28

Fed. R. Civ. P. 8(e) .............................................................................28

Fed. R. Civ. P. 15(b)(2) ......................................................................29

Fed. R. Civ. P. 65 .................................................................................1

**Legislative Material**

H.R. Rep. No. 94-1558 (1976) .............................................................38

S. Rep. No. 94-1101 (1976), 1976 U.S.C.C.A.N. 5912 (1976) .............38

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The United States District Court for the Middle District of Georgia had juris-diction below in relevant part pursuant to 42 U.S.C. § 1983, insofar as Plaintiff-Appellant Thomas Hayden Barnes sought remedies for deprivations of his rights, privileges and immunities secured by the Constitution, in connection with which the District Court had authority under 28 U.S.C. §§ 1331 and 1343(a)(3) & (4) to entertain the action, authority under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 65 to grant declaratory and injunctive relief, and authority under 42 U.S.C. § 1988 to award attorney's fees.

This Court has jurisdiction under 28 U.S.C. § 1291 over Plaintiff-Appellant's post-trial appeal of a now final judgment on the cross-motions for summary judgment of his First Amendment retaliation claim,[1] and of the final judgment awarding attorney's fees.  Appellant's notice of appeal was timely filed August 22, 2013, after entry of a final judgment on attorney's fees on July 25, 2013, which brought District Court proceedings to a close.

---

[1] Appellant does not seek review of the summary judgment order with respect to Defendant-Appellees McMillan and Gaskins.  In addition, the jury award of damages for out-of-pocket expenses arising from the violation of Plaintiff's due process rights has not been cross-appealed, is therefore final, and is thus not at issue here.

1

## STATEMENT OF THE ISSUES

1.    Whether the District Court misread Plaintiff's complaint and erroneously decided the parties' cross motions for summary judgment on Plaintiff's First Amendment claim where a university president knowingly retaliated against a student based on the student's constitutionally-protected speech?

2.    Whether the District Court erred by awarding reverse attorney's fees to Defendants when Plaintiff was the prevailing party on a significant claim and his unsuccessful claims were not frivolous?

3.    Whether the District Court erred by refusing to grant fully compensatory attorney's fees sought by Plaintiff as a prevailing party?

## STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND

This case arose from the summary expulsion of Plaintiff-Appellant, Thomas Hayden Barnes from Valdosta State University ("VSU") in May 2007 because he protested the building of a parking deck on campus.  The undisputed record and findings below established that Defendant-Appellee Ronald Zaccari expelled Barnes without notice or hearing because of Barnes' publicly-expressed views regarding a construction project Zaccari favored.  The basic facts and sequence of events are set forth in this Court's previous opinion.  *Barnes v. Zaccari*, 669 F.3d 1295, 1298-1301 (11th Cir. 2012).

2

### 1.    Zaccari's Reaction to Barnes' Speech

Upon learning of a plan to build a parking deck on the VSU campus, Barnes posted flyers in March 2007 expressing concern for its possible environmental consequences. (Dkt. #179-9, Barnes SJ Br., Ex. 22). Appellee Zaccari saw Barnes' flyers on campus and directed his administrative assistant, Thressea Boyd, to find out who was responsible. (Dkt. #1, Compl. ¶ 2; Dkt. #179-24, Barnes SJ Br., Ex. 5 at 1; Dkt. #190, Zaccari Dep. 49:5-6). At trial, Zaccari testified that he was upset with the content of the fliers because he believed Barnes misunderstood a project that Zaccari believed was very important to the University.[2]

After his assistant identified Barnes as the author of the flyers, Zaccari complained to a student group about him, prompting Barnes to withdraw the fliers and write a letter of apology. (Dkt. #1,  ¶ 3;  Dkt. #380, Tr. Vol. 2, 178:1-23; 181:17-24; Dkt. #381, Tr. Vol. 3, 41:12-42:18; 43:4-44:6.) Zaccari immediately had his assistant report the withdrawal of the fliers to the Board of Regents

---

[2] *See, e.g.*, Dkt. #380, Tr. Vol. 2, 189:20-190:5 (explaining that he was "very, very concerned" that Barnes "simply didn't understand" the need for the parking deck or all the work that went into it), 189:14-17 (Barnes "was totally incorrect"); Dkt. #381, Tr. Vol. 3, 47:15-21 (Zaccari was concerned that Barnes' advocacy was inaccurate and naïve).

("BOR"), informing that body that "Mr. Barnes is withdrawing his opposition to VSU's parking garage."[3]

Although Barnes removed the fliers, he was still interested in issues raised by the proposed parking deck, and he contacted several members of the BOR to express his concerns.  Barnes described his endeavor as similar to "calling your Congress person," (Dkt. #379, Tr. Vol. 1, 50:10-24), and the District Court found that "Barnes's message to the BOR members was at all times respectful."  (Dkt. #244, Order at 5).  (*See*  Dkt. #190, Zaccari Dep. 99:6-8).  Nevertheless, BOR Vice Chancellor Linda Daniels called Dr. Zaccari about the communication from Barnes and urged him to deal with the possible protest at the campus level and to get the student to "see a different perspective."[4]  Daniels testified that she wanted to forestall "a very tedious kind of uninformed objections about a parking deck." (Dkt. #180, Daniels Dep. 40:6-11).

After Vice Chancellor Daniels called Zaccari, Barnes was summoned to the President's office that same day with instructions to be there "at 5 o'clock sharp." (*See* Dkt. #379, Barnes Test., Tr. Vol. 1, 54:19-22).  Dean of Students Russ Mast also attended the April 16 meeting between Zaccari and Barnes.  Zaccari was

---

[3] Barnes SJ Br., Ex. 24 (March 26, 2007 email from Thressea Boyd to Beheruz Sethna); Dkt. #381, Boyd Test., Tr. Vol. 3, 113:5-25.

[4] Dkt. #179-2, Barnes SJ Br. at 8; Dkt. #190, Zaccari Dep. 99:9-100:13; Dkt. #180, Daniels Dep. 38:4-39:22, 40:20-41:11.

"agitated" because Barnes had not ceased his opposition to the project, and opened the meeting by complaining that "he thought that [Barnes] had 'gone away.'" (Dkt. #179-22, Barnes SJ Br., Ex. 3 at 4). Zaccari told Barnes his advocacy had "made life hard" for Zaccari, and that he "could not forgive" the student for his actions.[5] At trial, Zaccari confirmed that he was displeased that Barnes had resumed his protest and that his tone in the meeting was "stern" as he attempted to set the student straight. (Dkt. #381, Tr. Vol. 3, 48:25-51:9). Zaccari confirmed Barnes had no plans to attend the BOR meeting the next day in Statesboro, Georgia or to stage a protest. (Dkt. #190, Zaccari Dep. 98:14-18).

While he attended the BOR meeting, Zaccari initiated inquiries into Barnes' academic status to determine if there might be grounds for withdrawing him from VSU. (Dkt. #190, Zaccari Dep. 190:1-192:10; Dkt. #183, Gaskins Dep. 72:3-8, 76:9-20). By Zaccari's own admission, he began investigating Barnes' academic background due to his concerns about Barnes' political views.[6] In addition to

---

[5] Dkt. #197, Barnes Dep. 161:20-162:9; 178:9-16. *See* Dkt. #381, Mast Test., Tr. Vol. 3, 196:20-197:3; Dkt. #186, Mast Dep. 25:10-12 ("[t]he President was upset that Hayden had went [sic] to the members of the Board of Regents" and "was embarrassed that he did not come and talk to him about that").

[6] Dkt. #381, Tr. Vol. 3, 30:8-12 ("I can't understand, after all these years, why we have a protest just before we go to approval. That is why I started to look into Mr. Barnes and his background academically…and I began to find out a little more about him."), 54:7-55:18 (even without any perceived threat, Zaccari investigated Barnes' political views).

scouring Barnes' academic record, Zaccari directed members of his staff to conduct inquiries into Barnes' medical history, his religion, and his registration with the VSU Access Office, where Barnes was receiving accommodation as a disabled student.[7]

On April 19, *The Spectator* published a letter to the editor that Barnes had written several weeks earlier regarding the parking garage proposal. (Dkt. #179-9, Barnes SJ Br., Ex. 21). Zaccari had returned from the BOR meeting by then and read Barnes' letter the day it appeared in *The Spectator*. He summoned Access Office Director Tanner to his office and told her "the student who had been doing the posters…had been having communications and they were getting increasingly difficult." (Dkt. #189, Tanner Dep. 22:24-26:21). He asked Tanner to "provide any supportive information for how to deal with Hayden." (*Id*. 23:8-12). Tanner disclosed the contents of Barnes' confidential file to Zaccari, including a letter from Barnes' psychiatrist discussing the student's medical history. (*Id*. 24:2-25:18). That same day, Dr. Zaccari's assistant forwarded him an article entitled "Laws Limit Options When a Student is Mentally Ill."[8]

---

[7] Dkt. #183, Gaskins Dep. 45:9-46:2, 114:19-115:9; Dkt. #182, Farmer Dep. 14:12-16:17; Dkt. #189, Tanner Dep. 24:7-26:9.

[8] Dkt. #190, Zaccari Dep. 203:3-205:4; Dkt. #381, Zaccari Cross-Exam., Tr. Vol. 3, 58:24-59:25.

### 2.    Zaccari Involved Others in His Plan to Expel Barnes

The morning of April 20, Zaccari attended a Faculty Senate breakfast, where he expressed his frustration with the opposition to his parking deck plan.  (Dkt. #190, Zaccari Dep. 197:15-200:5).  A professor in the audience, Dr. Michael Noll, one of Barnes' teachers, approached Zaccari to discern whether Barnes was the subject of Zaccari's ire and to ask if he could help mediate the situation.  Zaccari rejected the offer, and told Dr. Noll that the administration would "deal with the student."  (*Id*. 199:9-18).

Sometime after the breakfast on April 20, Zaccari's assistant gave him a copy of a satiric collage about the parking deck that had been downloaded from Barnes' Facebook.com page.  (Dkt. #190, Zaccari Dep. 127:21-130:22).  The political cartoon included images of a multi-level parking structure, a bulldozer, a globe flattened by a tire tread, an asthma inhaler, and a picture of a public bus under a no-smoking style "not allowed" red circle and slash.  It also included slogans such as "more smog," "bus system that might have been," "climate change statement for President Zaccari," and "S.A.V.E.-Zaccari Memorial Parking Garage" next to a photo of Zaccari.  (Dkt. #179-9, Barnes SJ Br., Ex. 25).

Zaccari testified that the discovery of the collage on April 20 marked the beginning of his security concerns about Barnes.  (Dkt. #381, Tr. Vol. 3, 52:14-21, 58:7-10, 63:3-19).   The collage was appended to Barnes' expulsion notice,

7

described as a "threatening document," and was the basis for the assertion that Barnes was considered "a clear and present danger to this campus." (Dkt. #179, Barnes SJ Br., Ex. 2).

Zaccari convened a series of meetings for the sole purpose of dealing with Barnes. On April 20, Zaccari called a meeting that included his assistant, VSU Police Major Ann Farmer, Dean Russ Mast, Vice President of Student Affairs Kurt Keppler, VSU counsel Laverne Gaskins, and Access Office Director Kim Tanner. Zaccari complained about Barnes' speech regarding the parking garage and told the group he had already looked into Barnes' employment status and his grades. Zaccari distributed copies of Barnes' satirical Facebook.com collage and said he believed it represented an indirect threat because it contained the word "memorial." (Dkt. #231-24, Farmer Meeting Notes, Ex. 30 at 1-5).

Several of the attendees provided information or offered suggestions for various ways Barnes might be withdrawn. Tanner, for example, brought Barnes' Access Office file to the meeting and disclosed that he was registered with the Office and provided details regarding his medical history. Dean Mast, who had helped gather background information on Barnes, including his employment and prior schooling, (Dkt. #179-2, Barnes SJ Br. at 46 n.57), suggested that a "veiled threat" could be used to support a "disorderly conduct withdrawal." (Dkt. #234, Barnes Consol. Reply at 40). Meanwhile, Defendant Keppler suggested that

8

another way to remove Barnes would be to "go the route of the GPA," meaning that they should pursue expulsion on academic grounds. (*Id.*).

After the April 20 meeting, Major Farmer conducted an investigation and quickly determined that Zaccari's professed concerns of a threat were not credible. (Dkt. #182, Farmer Dep. 34:21-35:7, 43:17-20, 41:20-23, 42:19-22). Likewise, in follow-up meetings, other participants concluded Zaccari's concerns were an "overreaction." (Dkt. #185, Lee Dep. 75:14-17). In particular, Barnes' counselor, Leah McMillan, told Zaccari she had "never at any time observed any behaviors that warranted [her] being concerned that Mr. Barnes was a threat to himself or to anyone else." (Dkt. #187, McMillan Dep. 18:3-6). Likewise, Dr. Victor Morgan, Director of the Counseling Center, confirmed that there was no basis for a mental health withdrawal (which would have required some evidence of a threat), and that the Counseling Center would not support such a proceeding. (Dkt. #172, Morgan Dep. 22:23-23:15).

Nevertheless, at least six additional meetings were held to consider various ways to deal with Barnes. On April 24, 2007, Zaccari summoned McMillan to his office to discuss Barnes' advocacy about the parking deck and to get more information on his treatment history. (Dkt. #187, McMillan Dep. 17:12-18:9; Dkt. #190, Zaccari Dep. 170:4-7; Dkt. #179-19, Barnes SJ Br., Ex. 20 at 14). McMillan described her counseling sessions with Barnes but confirmed that she did not

consider him any kind of threat.  On April 25, Vice President Keppler convened a
meeting to discuss the situation with Mast, Assistant Dean of Students Richard
Lee, Tanner, and Erin Sandonato, a residence hall director, but the group did not
see any instance where Barnes' speech activities were in violation of the VSU
Code of Conduct.  (Dkt. #185, Lee Dep. 61:3-7, 61:24-62:25).  On April 26,
Zaccari called another meeting with Keppler, McMillan, and Dr. Morgan, who
confirmed that the Counseling Center would not support a withdrawal for mental
health reasons.  (Dkt. #172, Morgan Dep. 22:23-23:15).

    Finding nothing to support his "threat" claims, Zaccari looked for a process
for withdrawing Barnes that did not require a hearing or the presentation of
evidence.  (Dkt. #190, Zaccari Dep. 247:10-248:9;  Dkt. #182, Farmer Dep. 54:12-
57:15).  He directed VSU counsel Gaskins to contact Elizabeth Neely, the BOR's
Vice Chancellor for Legal Affairs, to determine how a university president could
file a complaint against a student "for a violation of the Student Code of Conduct."
(Dkt. #179, Barnes SJ Br., Ex. 40; Dkt. #183, Gaskins Dep. 14:13-19:5; Dkt. #190,
Zaccari Dep. 234:11-235:14).  Although Zaccari was cautioned "[i]t is not good
practice for the President to be bringing a complaint against any student," because
"[o]nce the President has made a decision in a matter, there is no due process at the
campus level," (Dkt. #179-7, Barnes SJ Br., Ex. 40; Dkt. #188, Neely Dep. 14:5-
16; Dkt. #190, Zaccari Dep. 235:10-20), Zaccari concluded he could create a

procedure that he dubbed an "administrative withdrawal," which would require no substantiation of his charges. (Dkt. #190, Zaccari Dep. 247:10-248:9).

Zaccari announced his intention to use the "administrative withdrawal" procedure at a May 3 meeting attended by Keppler, Boyd, Mast, Major Farmer, Police Chief Scott Doner, Gaskins, Dr. Tanner, and Dr. Morgan. Gaskins told the group that a student in this circumstance "[is] entitled to due process" and expressed concern that any type of withdrawal would leave VSU in a precarious legal position. (Dkt. #183, Gaskins Dep. 89:9-12; Dkt. #182, Farmer Dep. 62:20-21). Despite these concerns, Zaccari told the group that the only remaining questions were "when to withdraw [Barnes] and who is going to notify him." (Dkt. #172, Morgan Dep. 28:4-6). No one disagreed.

Four days later, on May 7, a withdrawal notice was delivered to Barnes by slipping a copy under his dorm room door. (Dkt. #197, Barnes Dep. 179:4-11). The notice, signed by Zaccari, expelled Barnes by claiming he was a "clear and present danger" to the campus, and listed two conditions for readmission – that Barnes provide (1) "correspondence from a non-university appointed psychiatrist indicating that you are not a danger to yourself and others"; and (2) documentation "from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy." (Dkt. #179-21, Barnes SJ Br., Ex. 2).

11

### 3.    Barnes' Appeal of the Withdrawal

Within one day of receiving the withdrawal notice, Barnes filed for reinstatement with President Zaccari, submitting the required letters. (Dkt. #179-7 and 179-8, Barnes SJ Br., Ex. 48, Ex. 50). However, Zaccari ignored the letters, and never disclosed to the BOR that he had received them. (Dkt. #190, Zaccari Dep. 254:4-255:14). Accordingly, Barnes appealed directly to the BOR, *pro se*, on May 21, 2007. (Dkt. #179-22, Barnes SJ Br., Ex. 3). Zaccari defended the expulsion and his support of the parking garage in a lengthy letter drafted with Gaskins' assistance, and accused Barnes of "mocking" him and of expressing "opposition to the administrative policies of the University and the University System of Georgia." (Dkt. #179-24, Barnes SJ Br., Ex. 5 (Ltr. from Zaccari to Neely, June 21, 2007 at 3)). He described Barnes' expulsion as a collective decision reached after consultation with "members of the President's administrative unit." He specifically named Kurt Keppler, Dr. Louis Levy, James Black, Scott Sikes, Dr. Marsha Krotseng, Police Chief Doner, and Major Farmer as being involved.[9] (*Id*. at 4).

In August 2007, the BOR referred the appeal to an administrative law judge at the Office of State Administrative Hearings. With the State Attorney General's

---

[9]    Barnes learned of this collective decision through documents obtained under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g.

Office representing VSU, Appellant faced significant difficulty obtaining counsel. He consulted with fifteen to twenty lawyers in Valdosta and around the State of Georgia without success.  The case was particularly unattractive for local counsel in Valdosta and Atlanta for a variety of reasons, not the least of which was that it involved a challenge to the University System of Georgia.  (*See* Dkt. #367-11, Barnes Aff. ¶¶ 1-7).  Accordingly, Barnes was forced to seek counsel from outside the community with relevant expertise in First Amendment, Due Process, and constitutional law, and the ability to take on the case on a deferred-fees basis.  (*Id.*).

Once retained, counsel for Barnes sought to settle the case with the BOR. However, after the BOR became aware that Barnes had obtained counsel, it cancelled the administrative hearing.  Despite repeated attempts by Plaintiff, no settlement was reached, and Barnes filed suit.  (Dkt. #1, Compl.).  After the instant lawsuit was filed, the BOR reversed Barnes' expulsion in a closed session on January 16, 2008.  (Dkt. #179-8, Ex. 54).

### B.    ALLEGATIONS IN THE COMPLAINT

Barnes filed a Complaint for declaratory and injunctive relief and damages, naming as defendants VSU, the BOR, VSU President Zaccari, University Counsel Gaskins, Vice President Keppler, Dean Mast, Counseling Center Director Morgan, and VSU Counselor McMillan.  (Dkt. #1, Compl.).  Pursuant to 42 U.S.C. § 1983, the complaint alleged the Defendants violated Barnes' First and Fourteenth

Amendment rights. It also alleged that the Defendants subjected him to intentional discrimination in violation of Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Barnes further alleged that failure to provide the procedures and rights guaranteed by VSU and BOR policies and procedures was a breach of contract.

### C.    PROCEEDINGS BELOW

#### 1.    Decision on Motions to Dismiss

The District Court denied Defendants' motions to dismiss Barnes' First and Fourteenth Amendment claims asserting individual liability under 42 U.S.C. § 1983, as well as his breach of contract, ADA, and Rehabilitation Act claims against the BOR and VSU. (Dkt. #37). The court denied Defendants' qualified immunity defense as to Barnes' individual liability claims. It otherwise dismissed Barnes' First and Fourteenth Amendment official capacity claims against individual Defendants, dismissed those claims entirely against VSU and the BOR pursuant to the Eleventh Amendment, and dismissed claims against Victor Morgan.

#### 2.    Decision on Cross-Motions for Summary Judgment

Following discovery, Barnes and all the Defendants filed cross-motions for summary judgment. (*See* Dkt. #179, Barnes SJ Br.; Dkt. #177, VSU Defs. SJ Br.; Dkt. #174, Gaskins SJ Br.; Dkt. #167, McMillan SJ Br.). The District Court granted summary judgment for Barnes on Count 4 of the Complaint, holding that

Defendant Zaccari had violated the plaintiff's right to procedural due process. (Dkt. #244, Order at 44-46). It also granted summary judgment for Barnes on Count 5, holding the BOR's failure to provide due process was a breach of contract. (*Id*. at 46-49).

The Court denied Barnes' First Amendment retaliation claim, narrowly construing the complaint as alleging only a conspiracy. The Court further held the other individual Defendants were not liable for denying procedural due process, and that Barnes suffered no substantive due process violation. The District Court also denied Barnes' ADA and Rehabilitation Act claims on grounds that Barnes was not "substantially limited" in his ability to learn (*id*. at 53-54), and dismissed VSU as a named party in the action.

### 3.    Interlocutory Appeal

Defendants Zaccari and the BOR filed an interlocutory appeal to this Court on the issue of Zaccari's qualified immunity defense and the breach of contract issue. (Dkt. #249). Barnes filed a cross-appeal on the District Court's summary judgment decision on the First Amendment and substantive due process claims. Barnes also appealed the dismissal of his claims under the ADA and Rehabilitation Act, as well as the decision to deny injunctive relief. (Dkt. #255).

This Court affirmed the District Court's denial of Zaccari's motion for summary judgment based on qualified immunity and remanded for further

proceedings. *Barnes v. Zaccari*, 669 F.3d 1295, 1309 (11th Cir. 2012). It also held that Georgia has not waived its Eleventh Amendment immunity for breach of contract actions and reversed the District Court's order on that issue for want of jurisdiction. *Id*. The Court did not address Barnes' cross-appeal, noting that, because final judgment had not yet been entered, the other claims were not ripe for review.

### 4.    Trial on Damages

On remand, the case was transferred from the Northern District of Georgia to the Middle District, and a jury trial was conducted January 28 through February 1, 2013. The jury awarded Barnes $50,000 in compensatory damages for his injuries arising from the deprivation of procedural due process rights. The District Court denied Defendants' post-trial motion for judgment as a matter of law on the issue of qualified immunity.

### 5.    District Court Decision on Fees

Barnes filed a motion for attorney's fees as the prevailing party pursuant to 42 U.S.C. § 1988. (Dkt. #367). Defendants McMillan, Gaskins, Keppler, and Mast filed motions for reverse fees as prevailing defendants, claiming that where Plaintiff's claims against these Defendants were not successful, they were frivolous and justified a recovery of attorneys' fees. (Dkt. #364, 366, 368).

The District Court granted Barnes' motion for fees, finding that Barnes is a prevailing plaintiff given his success on the procedural due process claim against Zaccari.  However, the Court applied mid-level billing rates for Atlanta, Georgia and not Washington, D.C., and further imposed an across-the-board downward adjustment of 60 percent based on a conclusion that "the level of success achieved by Barnes does not justify an award equivalent to the full lodestar amount."  (Dkt. #405, Order at 56).  The Court based its decision on the "disparity between the amount of damages sought by Barnes as compared with the actual amount of recovery," but did not give countervailing weight to the public benefit of vindicating a constitutional right.  (*Id*. at 58).

The court also granted reverse fees and expenses to Defendant McMillan, Defendants VSU, Keppler, Mast, and Morgan, and to Defendant Gaskins on the basis that Barnes was unable to "establish a prima facie case" against those defendants.  (*See* Dkt. #405, Order at 26).

## STANDARD OF REVIEW

This Court reviews a district court's rulings on motions for summary judgment *de novo*, based on an independent examination of the record, *Duke v. Massey*, 87 F.3d 1226, 1230-31 (11th Cir. 1996), which requires the Court to review the evidence in the light most favorable to the non-moving party, unless the facts and inferences point overwhelmingly in favor of the movant.  *Morris v.*

17

*Crow*, 117 F.3d 449, 455 (11th Cir. 1997). In doing so, the Court does not review the propriety of the summary judgment order based on the evidence available when the motion was made, but rather examines the record to see if by trial the evidence has been supplemented or changed in some manner favorable to the party who opposed summary judgment. *Wenzel v. Boyles Galvanizing Co.*, 920 F.2d 778, 782 (11th Cir. 1991). Independent examination of the record by this Court also is required insofar as Plaintiff-Appellant raises claims under the First Amendment. *E.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984); *Flannigan's Enters., Inc. v. Fulton Cnty.*, 596 F.3d 1265, 1275-76 (11th Cir. 2010).

As to the District Court's ruling on attorney's fees, this Court's review is for abuse of discretion, though in doing so it will "still…closely scrutinize questions of law decided by the district court in reaching [the] fee award." *Thompson v. Pharmacy Corp. of Am., Inc.*, 334 F.3d 1242, 1244 (11th Cir. 2003). In addition, while the abuse of discretion standard applies to the threshold determination of whether a plaintiff's case was frivolous, unreasonable, or groundless, in determining whether a claim was or became frivolous, the evidence is viewed in the light most favorable to the non-prevailing plaintiff. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1179-80 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

The record is clear that Thomas Hayden Barnes was subjected to retaliation at VSU for First Amendment-protected activities.  The District Court, however, erroneously granted summary judgment for Defendants on the retaliation claim by misreading the Complaint to allege only a conspiracy.  This narrow reading overlooks the plain language of the Complaint, which clearly alleges individual liability, as all the Defendants well understood.  However, even if the Complaint could be construed to allege only a conspiracy, the District Court erred in granting summary judgment on this record.

The District Court also improperly awarded "reverse fees" under 42 U.S.C. § 1988 to the Defendants on the theory that Plaintiff's unsuccessful claims were frivolous, unreasonable, or without foundation.  This holding is based on hindsight logic that confuses lack of ultimate success with frivolity.  This conclusion will have to be reconsidered if this Court reverses the First Amendment claim, but even if it does not, Plaintiff provided substantial evidentiary support for his contentions, making them far from "frivolous."  Even if the reverse fees could be justified, the District Court's award was excessive and conflicts with Supreme Court precedent.

The District Court also improperly reduced the fee award to Barnes as the prevailing plaintiff.  Reversal of the lower court's First Amendment retaliation ruling will affect this issue as well, but the District Court's calculation of the fee is

19

seriously flawed in other ways. It overlooks the fact that hours spent on unsuccessful claims were already deleted in calculating the lodestar, making an across-the-board sixty percent reduction duplicative. The District Court also used a mathematical formula that the Supreme Court has rejected to calculate its fee reduction, and erroneously ignores the significant public benefit of the ruling below vindicating Barnes' constitutional rights. The District Court also inappropriately reduced billing rates by up to fifty percent for Washington, D.C. counsel by ignoring record evidence of comparable rates in the Atlanta market.

## ARGUMENT

I. **THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM**

### A. **Barnes' Expulsion is a Classic Case of Unconstitutional Retaliation**

From the beginning of this case it was clear that Barnes was expelled because he criticized a construction project favored by the University President. Such retaliation by a state official for the exercise of free expression "is particularly proscribed by the First Amendment." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). *See Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005) (state officials "may not retaliate against private citizens because of the exercise of their First Amendment rights"). Unconstitutional interference with freedom of speech can take many forms: retaliatory prosecutions, *Singer v. Fulton*

*Cnty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995); disciplinary actions, *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011); nonrenewal of contracts or employment, *Mangieri v. DCH Healthcare Auth.*, 304 F.3d 1072, 1075 (11th Cir. 2002); denial of benefits, *Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988);  or – as in this case – sanctioning or expelling a student from a state university.  *Keeton v. Anderson-Wiley*, 664 F.3d 865, 877-78 (11th Cir. 2011);  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500-501 (4th Cir. 2005).

This Court has articulated a three-part test for First Amendment retaliation: (1) the plaintiff's speech or act must be constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the speech; and (3) there is a causal connection between the retaliatory actions and the impact on speech. *Hendrix*, 423 F.3d at 1250.  In this case, the allegations in the Complaint and summary judgment pleadings and exhibits fully supported Barnes' First Amendment retaliation claim, and the evidence presented at the trial on damages for the violation of Barnes' due process rights starkly confirmed the extent of the First Amendment violation.

*First*, there is no question but that the plaintiff's speech is fully protected by the First Amendment.  Barnes' efforts to raise awareness of the environmental impact of the proposed construction of a parking garage through the use of flyers,

online postings, calls and emails to BOR members, and a letter to the editor of *The Spectator* all constitute protected speech in its "most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). (*See* Dkt. #37, Order at 13). Although Defendant Zaccari attempted to justify his decision to expel the plaintiff based on a satiric collage that Barnes posted privately on Facebook.com, such communication plainly is protected by the First Amendment. *Eiland v. City of Montgomery*, 797 F.2d 953, 959-60 (11th Cir. 1986) (satirical poem criticizing mayor is protected speech).

Zaccari's argument that the Facebook cartoon is not protected because it constitutes a "threat" or "fighting words" is wrong as a matter of law[10] and was debunked by the District Court. The Court observed that "the inclusion of the word 'memorial' by its mere utterance in a photo collage that was posted on an internet website simply cannot be rationally construed as likely to incite immediate violence, even in the wake of the Virginia Tech tragedy that the defendants allude to in their motion." (Dkt. #37, Order at 14). After trial, the District Court denied Defendant Zaccari's motion for judgment as a matter of law, finding "sufficient

---

[10] *See* Dkt. #179-2, Barnes SJ Br. at 28-30, 36-39; Dkt. #224, Barnes Opp. to Def. SJ Mot. at 23-28. In an analogous case, this Court rejected claims that biting satire that included the line "Let's make Emory a memory," could be interpreted as "a veiled assassination threat," describing it as "simply impossible under any reasonable construction of the poem to reach such an absurd conclusion." *Eiland*, 797 F.2d at 959 n.8. *See United States v. Alaboud*, 347 F.3d 1293, 1297 (11th Cir. 2003) ("offending remarks must be measured by an objective standard").

evidence on the record to conclude that, as a matter of fact, Zaccari could not, and did not, reasonably believe there was an emergency on the campus of VSU during spring 2007." (Dkt. #405, Order at 23). Moreover, the argument ignores entirely Zaccari's retaliatory actions toward the bulk of Plaintiff's speech, including the flyers, the letter to the editor, and other communications.

*Second*, Defendants' various actions that culminated in Barnes' dismissal from VSU adversely affected his right to freedom of expression. A person suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Hendrix*, 423 F.3d at 1250. In this regard, even a "verbal censure" from a school official has been deemed sufficient, because it "cannot help but have a tremendous chilling effect on the exercise of First Amendment rights." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1268-69 (11th Cir. 2004). *See also Constantine*, 411 F.3d at 500-501 (adversely manipulating student exam schedule in reaction to student criticism constitutes adverse action for purposes of a retaliation claim).

Obviously, to be expelled from school for expressing opinions is a severe adverse effect. *Goss v. Lopez*, 419 U.S. 565, 584 (1975); *Zwick v. Regents of Univ. of Mich.*, 2008 WL 1902031, at *9 (E.D. Mich. Apr. 28, 2008) ("dismissal … would clearly have the effect of chilling speech at the…school"). But in this case,

23

the Defendant's retaliatory actions began long before the expulsion order, starting immediately after Barnes posted flyers on campus. The University President sought out the name of the student responsible for the flyers, complained about him to a student organization, and reported on his activities to state officials. (Dkt. #179-2, Barnes SJ Br. at 4-5).

When he learned that Barnes had not ceased his advocacy, he called a meeting and sternly rebuked the student for failing to grasp the wisdom of the parking garage project. (*Id*. at 6-8). And Zaccari investigated Barnes' background, looking for ways to academically withdraw the student – all before Zaccari ever saw the Facebook.com cartoon that later became the pretext for the expulsion. (*Id*. at 8-9). Zaccari's admonishment of Barnes merely for expressing an opinion on a public issue is certainly the type of official scrutiny that would chill the speech activities of a student of "ordinary firmness." *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights, [the effect on freedom of speech] need not be great in order to be actionable.").

When Barnes failed to "go away" and remain silent, Zaccari immediately put him under surveillance, and sought and obtained confidential information about Barnes from the Access Office and the Counseling Center. (Dkt. #179-2, Barnes SJ Br. at 10-13;   Dkt. #374, Barnes Opp. to Mot. for Finding of Qualified

24

Immunity at 5-6). Even such actions as disclosure of information "may constitute adverse action if it is 'sufficiently embarrassing, humiliating, or emotionally distressful.'" *Constantine*, 411 F.3d at 500 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 688 (4th Cir. 2000)). The misuse of confidential information clearly supports a First Amendment retaliation claim, even where the student is not later expelled and falsely branded a "clear and present danger." *E.g.*, *Bloch v. Ribar*, 156 F.3d 673, 680-81 (6th Cir. 1998).

**Third**, there is a clear causal connection between Zaccari's retaliatory actions and the impact on Barnes' speech. The "administrative withdrawal" notice itself drew the link between the "attached threatening document" (the Facebook.com political cartoon) and Barnes' expulsion. Even before Barnes was forced to leave, however, Zaccari's actions chilled his expressive activities and punished the student for expressing an opinion on political issues. A First Amendment retaliation claim arises not only when a person is denied constitutional rights, but also when he is penalized for exercising them. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (11th Cir. 1999) (*per curiam*); *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994) ("[T]he injury to this [First Amendment] right inheres in the retaliatory conduct itself."). Indeed, Zaccari never suggested he was not motivated by Barnes' speech activities; he has only claimed that his actions were justified – a claim the District Court rejected.

25

## B.     The District Court Erroneously Decided Summary Judgment Because it Misread the Complaint

The District Court's order on summary judgment left no doubt about the fact that Zaccari expelled Barnes because of his speech.  (*See* Dkt. #244, Order at 1-20 (recitation of facts)).  But the Court granted the Defendants' motions for summary judgment on grounds that it found no conspiracy to violate Barnes' rights had been established because "the undisputed facts show that Zaccari ***alone*** made the decision to administratively withdraw Barnes from VSU."  (*Id*. at 26) (emphasis added).  The court further concluded that the Complaint "does not contain a stand alone claim for retaliation against Zaccari."  (*Id*. at 43 n.28).

This narrow reading of the Complaint came as quite a surprise not just to the Plaintiff, but to Defendant Zaccari as well, who at all times defended the case on the understanding that there was a retaliation claim against him individually.  Indeed, none of Zaccari's moving papers through the summary judgment stage even use the word "conspiracy," let alone make the argument that Barnes only alleged – but failed to prove – concerted action.[11]  The same is true for Defendant

---

[11] *See*, *e.g*., Dkt. #16, VSU Mot. to Dismiss at 9 (advocating dismissal of claims against Defendants *other than Zaccari* for lack of involvement);  Dkt. #29, VSU Reply in Support of Mot. to Dismiss at 2-4 (argument heading "Plaintiff's Retaliation Claim Against President Zaccari Fails" and defending other retaliation claims individually as well); Dkt. #177, VSU SJ Mot. at 23-35 (defending retaliation claims individually; conspiracy claim not mentioned);  Dkt. #216, VSU Opp. to Pl. Mot. for SJ at 11-13 (same).

McMillan.[12]  Only Defendant Gaskins made an argument that there was no civil rights conspiracy, but she understood the Complaint as alleging individual liability on the part of each of the Defendants as well, and opposed Barnes' retaliation claim on that basis.[13]

There is good reason for this.  The Complaint on its face alleges individual liability for each of the Defendants based on their roles in the underlying events leading to Barnes' dismissal.  (*See* Dkt. #1,¶¶ 38-39, 42-43, 45-49, 51, 59).  Only two paragraphs in the thirty-two page Complaint even use the word "conspiring" in relation to the Defendants.  (*Id*. ¶¶ 73, 86).  This Court has ample experience with cases involving civil rights conspiracies, and the operative language of such complaints is quite different from the allegations at issue here.  *Compare Burrell v. Board of Trs. of Ga. Military Coll*., 970 F.2d 785, 787 (11th Cir. 1992) (quoting conspiracy allegations from complaint).

For Zaccari in particular, the Complaint contained numerous factual allegations sufficient to establish his individual liability for First Amendment retaliation.  It alleged, for example, that "Zaccari had become increasingly upset

---

[12] *See* Dkt. #17, McMillan Mot. to Dismiss at 5-6 (interpreting retaliation claim as individual claim, not conspiracy); Dkt. #167, McMillan SJ Br. at 40-45 (same).

[13] Dkt. #174, Gaskins SJ Mot. at 15-17 (disputing conspiracy); *see id*. at 12-15 (disputing individual liability for retaliation).  *See also* Dkt. #206, Gaskins Reply Br. at 2-12 (devoting entire brief to question of individual liability).

with Barnes since the student first distributed fliers on campus in March 2007 opposing the proposed construction," that "Zaccari found these actions to be entirely unacceptable," and that he "took steps to suppress Barnes' exercise of his American birthright – the right to freedom of expression." (Dkt. #1, ¶ 2). It alleged further that "against the advice of counsel to the [BOR] that unilateral action would violate basic due process rights, Zaccari proceeded with his plan to expel Barnes from VSU." (*Id*. ¶ 5). Overall, the Complaint is replete with allegations of Zaccari's individual actions to violate Plaintiff's rights. (*Id*. ¶¶ 1-5, 26, 30-35, 37, 41, 50, 52, 60, 64).

The District Court's decision to grant summary judgment on the First Amendment retaliation claim is based on a clear misreading of the Complaint. Count 3 of the Complaint alleges "individual liability" under 42 U.S.C. § 1983 for the Free Speech Clause violation, names the "individual defendants in [their] personal capacity," and expressly incorporates all of the factual allegations that support individual liability. (*Id*. ¶ 84). Although one paragraph in Count 3 refers to "Defendants' actions in conspiring to expel Barnes from VSU," (Dkt. #1, ¶ 86), it does not purport to limit the other allegations, and there is no separate conspiracy claim under 42 U.S.C. § 1985.

By circumscribing Count 3 as alleging only a conspiracy, the District Court's interpretation violates basic principles that require pleadings to be

"construed so as to do justice." Fed. R. Civ. P. 8(e). The Rules require only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests. *Hamilton v. Allen-Bradley Co.*, 224 F.3d 819, 823-24 (11th Cir. 2001); *Sams v. United Food & Commercial Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989). Here, the Defendants' briefs make clear that they understood the Plaintiff to be asserting individual retaliation claims, which alone is sufficient to override the District Court's limiting construction of the Complaint.[14]

The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim. *Keene v. Prine*, 477 F. App'x 575, 583 (11th Cir. 2012). *See also Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 n.2 (11th Cir. 1997); *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981). Thus, the sufficiency of the complaint does not depend on the presence or absence of "magic

---

[14] Even if the District Court's narrow reading of the Complaint were correct, the Defendants implicitly consented to litigating First Amendment retaliation as stand-alone claims against each defendant individually. Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."). *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003).

words." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000). The court must look instead to the substance of the entire pleading, not just specific technical allegations, and if the evidence shows there was a violation of the plaintiff's rights, the complaint should be so construed. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324-27 (11th Cir. 2012) ("we no longer require the hyper-technical code pleadings of ages past"); *Evans*, 131 F.3d at 964 n.2. The "legal rights of the plaintiff are to be determined by the law and the facts as established in the case and not by the language asserting the claim." *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 177 n.1 (5th Cir. 1975). Accordingly, in this case the fact that two paragraphs of the Complaint used the word "conspiring" cannot cancel the rest of the well-pleaded allegations regarding First Amendment retaliation.

Here, there is no question but that the Complaint fully laid out the facts supporting individual First Amendment retaliation claims. Indeed, this is the opposite of the situation where a complaint is deficient because it makes bare legal allegations without pleading sufficient facts to back them up. *E.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). In this case, the extensive factual allegations of First Amendment retaliation set forth in the Complaint were presented at the outset and are fully reflected in the District Court's discussion of the background. (*Compare* Dkt. #1,

¶¶ 1-70, *with* Dkt. #244, at 1-20).  The District Court merely read the Complaint selectively to inappropriately narrow the claims.  That decision must be reversed.

### C.    The District Court's Decision is Erroneous Even if the Complaint Could Be Read as Alleging Only a Conspiracy

The District Court's conclusion that "Zaccari did not participate in any sort of conspiracy because no one would agree with [his] decision to withdraw Barnes," (Dkt. #244, Order at 43), even if relevant, also is incorrect.  Other Defendants offered suggestions for how Zaccari might remove Barnes from VSU even though they knew the President actually was concerned about the parking garage protest. They made these recommendations in a series of meetings held for the specific purpose of deciding how to expel Barnes even though they knew the particular route Zaccari chose was illegitimate.  (*See*, *e.g*., Dkt. #244, Order at 7-17).

This explains how Zaccari could assure the BOR that the decision to withdraw Barnes was a collective one reached after consultation with "members of the President's administrative unit."  (Dkt. #179-24, Ex. 5 (Ltr. from Zaccari to Neely, June 21, 2007)).  This Court in the interlocutory appeal surveyed the meetings between Zaccari and the other Defendants and noted that when the President announced his decision, "he did not ask those present if he was making the right decision, and no one told him he was. ***Collectively though, the group agreed that Barnes should be withdrawn on May 7***, a full four days later." *Barnes v. Zaccari*, 669 F.3d at 1301 (emphasis added).

31

These facts are sufficient to establish a civil rights conspiracy. A Section 1983 conspiracy claim does not require a showing of specific intent to deprive another of a federal right. *Burrell*, 970 F.2d at 793. All that is required is an "understanding" among the defendants that their actions may have that effect. *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990). Thus, a plaintiff is not required to produce a "smoking gun" in order to show such a common purpose. *Id.* at 469; *Burrell*, 970 F.2d at 792. It is enough to show an "understanding" and "willful participation" among the Defendants. *Id.*

Showing such an agreement often depends on circumstantial evidence because "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979); *Burrell*, 970 F.2d at 788 ("Circumstantial evidence has no less weight than direct evidence as long as it reasonably establishes that fact rather than anything else."). Accordingly, agreement to the "'overall objective'" of a conspiracy "'may be inferred from the conduct of the participants.'" *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010) (citations omitted). In *Crowe*, for example, the evidence "showed that the defendants had participated in private meetings at which [the plaintiff] was discussed." From this, along with the course of conduct toward the plaintiff, this Court held that "the jury could reasonably have inferred that a conspiracy existed." 595 F.2d at 993.

32

In this case, the evidence of agreement toward a common purpose is much more direct. Although none of the other Defendants believed Barnes represented any kind of threat, and all recognized that expulsion based on a student's speech would violate the First Amendment, they nevertheless participated in a series of meetings in which Barnes' potential dismissal was the only subject, and some offered suggestions for ways to achieve Zaccari's objective. They might have disagreed with Zaccari's chosen method of disposing of a troublesome student – or at least recognized the legal risk of doing so – but that did not prevent them from showing support for a decision they characterized as "beyond their pay grade." (Dkt. #179-2, Barnes SJ Mot. at 45 & n.56).

To be sure, administrators in a hierarchy may have an institutional incentive to manifest support for a decision while seeking to avoid any responsibility for the outcome, but such a bureaucratic survival instinct does not mean there was no "agreement." The other Defendants were knowing and willing enablers of Zaccari's unconstitutional purpose, even if they kept quiet when they realized the President's chosen method of implementing his decision went too far. They should not now be permitted to "hide behind the cloak of institutional loyalty." *Forsyth v. Kleindienst*, 599 F.2d 1203, 1217 (3d Cir. 1979); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981).

33

Moreover, Zaccari may have been the only one to sign the expulsion notice, but he did not act alone in sanctioning Barnes for his speech.  In addition to the named Defendants, other VSU personnel worked with him from the very beginning and supported his ultimate decision to expel Barnes.  *See United States v. Briggs*, 514 F.2d 794, 805 (5th Cir. 1975) ("The government may introduce evidence at trial of a person's participation in a conspiracy and thereby ascribe his acts and statements to the co-conspirators even if that person is not named in the indictment."); *United States v. Little*, 2012 WL 566805, at *3 n.3 (W.D. La. 2012) (same).

For example, Zaccari's administrative assistant investigated Barnes' posting of the fliers, reported to the BOR when they were taken down, and took it upon herself to supply Zaccari with information on how to remove "mentally ill" students from school.  (Dkt. #179-2, Barnes SJ Mot. at 6-7, 12 n.14).  (*See also id.* 14, 22, 65; Dkt. #374, Barnes Opp. to Mot. for Finding of Qualified Immunity at 3-7).  She expressed complete agreement with Zaccari's decision to remove Barnes for his speech activities even before Zaccari concocted his ultimate justification of a security threat.  Likewise, the Director of the VSU Access Office willingly assisted the President by disclosing Barnes' confidential files when Zaccari sought assistance in dealing with "the student who had been doing posters."  (Dkt. #179-2, Barnes SJ Mot. at 12-13;  Dkt. #374, Barnes Opp. to Mot. for Finding of Qualified

Immunity at 6). This information was instrumental in Zaccari's campaign to oust Barnes from campus.

### D. The District Court Must Be Directed to Award Appropriate Relief on the Retaliation Claim

This Court should direct the District Court to issue an order upholding Barnes' First Amendment retaliation claims. Although the decision below granted the Defendants' motions for summary judgment, it was based on a question of pure law – the interpretation of the Complaint. The facts were never in dispute; Zaccari justified his actions toward Barnes based on his speech. Moreover, it is unnecessary to evaluate the facts in a way most favorable to the nonmoving party. *Ortiz v. Jordan*, 131 S. Ct. 884, 889 (2011) ("Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion.") Not only were the material facts undisputed at the summary judgment stage, they were confirmed by trial testimony. (Dkt. #374, Barnes Opp. to Mot. for Finding of Qualified Immunity at 1 n.2). As a consequence, this Court may apply those facts to the appropriate law.

When the District Court's erroneous decision on the First Amendment retaliation claim is reversed, it will be necessary for that court to consider the issue

of further damages and other appropriate relief.[15]   This will include potential compensatory and punitive damages, but also injunctive relief, which the District Court had denied earlier.   (Dkt. #37, Order at 29). Because the damages arising from Zaccari's retaliation campaign include his branding the Plaintiff as a threat and as a "clear and present danger," Barnes had sought injunctive relief to correct the public record.   Accordingly, the reversal of the decision below must include the District Court's decision to deny equitable relief.

## II.    THE DISTRICT COURT ERRED BY GRANTING DEFENDANTS REVERSE ATTORNEY'S FEES

The District Court expressed considerable frustration on the issue of attorney's fees, stating that "the end result of this case, insofar as it pertains to attorney's fees, is absurd."  (Dkt. #405, Order at 59 n.16).  In a lengthy footnote at the end of the opinion, the Court observed that "[t]here was never any question but that Defendant expelled Plaintiff Barnes from Valdosta State University and denied Barnes due process."   Although the Court acknowledged that, in the end, "[j]ustice was done insofar as Barnes received a fair award of compensatory damages," it added that "[t]his case should have been settled long ago with an expenditure of attorney's fees commensurate with the results obtained."  *Id.*

---

[15]  This does not affect the award of damages for out-of-pocket expenses arising from Defendant Zaccari's violation of the Plaintiff's right to due process, the final order for which was not appealed.

36

We could not agree more.

There was never a question but that Barnes' constitutional rights had been trampled and that far too much effort was required to achieve justice for the Plaintiff.  It is also clear the case should have settled from the outset, which was why, in our very first contact with counsel for the Defendants, we urged an immediate settlement of the matter.  (Dkt. #367-1, Barnes Br. for Attorney's Fees at 5-7;  Dkt. #367-5, Corn-Revere Decl. ¶¶ 30-31).  Offers were made at each significant stage of the litigation, including when the District Court issued orders on Defendants' motions to dismiss and summary judgment, and after this Court denied Defendant Zaccari's interlocutory appeal.  (Dkt. #390, Barnes Reply Supporting Attorney's Fees at 2-3 & n.4).  Despite ongoing and repeated efforts to settle, the Defendants never offered Barnes more than $5,000 – ten percent of the amount the jury eventually awarded.  As Judge Lawson, noted, "[t]his can hardly be considered a serious settlement negotiation."  (Dkt. #405, Order at 35; *id*. at 40 ("Keppler never made any serious attempt to settle the case"); *id*. at 42 ("Mast did not make any serious settlement offer")).

So Barnes was faced with a stark and difficult choice: to pursue the litigation to its end or to give up and go home.  He elected to seek justice, but for reasons not entirely clear, the District Court blamed Barnes for the Defendants' recalcitrance

which only prolonged the litigation.[16]   The Court's displeasure was expressed in

two ways:  First, it awarded attorney's fees to prevailing Defendants in a manner

that quite nearly negated Plaintiff's fee award.   This award of reverse fees is

contrary to law, unsupported by the record, and should be reversed. And second, as

explained in the final argument below, it inappropriately reduced Plaintiff's award

of attorney's fees as the prevailing party.

### A.   Granting Reverse Fees Thwarts the Purpose of the Civil Rights Attorneys Fee Awards Act

Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976 to

ensure "effective access to the judicial process" to persons with civil rights

grievances.   H.R. Rep. No. 94-1558, at 1 (1976).   *See Hensley v. Eckerhart*,

461 U.S. 424, 429 (1983).   When a plaintiff succeeds in remedying a civil rights

violation, he serves "'as a "private attorney general," vindicating a policy that

Congress considered of the highest priority.'"   *Fox v. Vice*, 131 S. Ct. 2205, 2213

(2011) (citation omitted).   Under this law, a prevailing plaintiff "'should ordinarily

recover an attorney's fee unless special circumstances would render such an award

---

[16] The Court speculated that "Plaintiff took two calculated risks:  first, that he could get a large award of punitive damages, and second, that if he failed to get punitive damages, he could offset that failure by way of attorney's fees."   Dkt. #405, Order at 59 n.16.   However, this surmise is belied by the record, which showed that Plaintiff from the beginning urged the Defendants to engage in serious settlement talks, at least in significant part to forestall the growth of attorney's fees. Dkt. #390, Barnes Reply Supporting Attorney's Fees at 2-3 & n.4 (and attached exhibits); Dkt. #367-5, Corn-Revere Decl. ¶¶ 30-31.

unjust.'"  S. Rep. No. 94-1101, at 4 (1976), 1976 U.S.C.C.A.N. 5912 (1976).  In short – the presumption favors awarding the plaintiff a fully compensatory fee.

But while the allowance of fees for prevailing plaintiffs "was necessary to encourage vigorous enforcement of civil rights acts," Congress recognized "that private enforcement would be substantially deterred if parties who had good faith claims under the civil rights statutes faced the prospect of having to pay their opponent's fees should they lose."  *Keyes v. Lauga*, 635 F.2d 330, 334 (5th Cir. 1981).  For that reason, the "policy considerations which support the award of fees to a prevailing plaintiff are not present in the case of a prevailing defendant." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418-19 (1978).  Fees may be allowed to prevailing defendants only where there is a finding that plaintiff's action was "frivolous, unreasonable, or without foundation."  *Fox*, 131 S. Ct. at 2213 (quoting *Christiansburg*, 434 U.S. at 421).

For reverse fees, it is not enough that the defendant prevailed – he must show that the claims should never have been brought in the first place.  In making this determination, the Supreme Court cautioned that:

> it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.  This kind of hindsight logic could discourage all by the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success….

*Christiansburg*, 434 U.S. at 421-22.   Moreover, where the unsuccessful claims arise "out of the same set of circumstances" as the successful claim, as they did in this case, there is no basis for awarding fees to the defendant.  *Keyes*, 635 F.2d at 334.

The District Court's award of reverse fees to prevailing defendants undermines the Civil Rights Act's purpose.  The decision is incorrect, regardless of whether it arose from the District Court's desire to make a statement about what it perceived to be excessive fees, or from a genuine effort to apply the law to the facts.  As this Court found recently in *Wigfall v. Sodexo, Inc.*, 2013 WL 5302684, at *2 (11th Cir. Sept. 23, 2013), reverse fees are unwarranted even where a claim may be "exceedingly weak," involve "pure conjecture," or rests on "speculation" (quoting *Cordoba*, 419 F.3d at 1181).  Here, however, there was a substantial basis for the claims even where they did not succeed, and the award of reverse fees was clearly erroneous.

**B.     Plaintiff's Claims Against Prevailing Defendants Were Far From Frivolous**

It is important to note that the District Court's award of reverse fees is based on the assumption that the First Amendment retaliation claims were unsuccessful, a matter decided earlier by the Northern District.  Judge Lawson acknowledged that Barnes disputes that ruling, but held that "the Northern District's interpretation

of the claim is controlling for purposes of the present fee motions." (Dkt. #405, Order at 27 n.7). Accordingly, if this Court reverses the decision below on First Amendment retaliation, the reasoning underlying the fee awards unravels.

Even without a reversal of the First Amendment claims, however, the factual record amply illustrates the sound basis for Barnes' claims. The common thread in the District Court's decision as to all of the prevailing Defendants is the incorrect assumption that Zaccari acted alone in his effort to sanction Barnes for his speech. In this respect it is directly tied to the Court's erroneous ruling on First Amendment retaliation. Moreover, for the purpose of assessing reverse fees, the relevant issue is not whether Barnes ultimately proved that the Defendants acted collectively, but whether he had a reasonable belief that such was the case. *Cordoba*, 419 F.3d at 1176-77; *Sullivan v. School Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189 (11th Cir. 1985). *See also Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. 1981).

In this case, the allegations in Plaintiff's Complaint were based on documents Barnes obtained pursuant to his FERPA request, including Zaccari's June 21, 2007 letter defending his actions to the BOR. That letter outlined the series of events that Zaccari claimed formed the basis of the "collective" decision of campus administrators to expel Barnes. (Dkt. #179-24, Barnes SJ Br., Ex. 5). Zaccari explained to the BOR that he is "not an expert in the field of mental

health," and that he "felt it necessary to defer to the experts and incorporated their input as a condition for Mr. Barnes readmission." (*Id*. at 7). Zaccari maintained this story at his deposition and throughout discovery, and testified at trial that Barnes was expelled after his consultation with campus administrators including Keppler, Mast, Gaskins, and McMillan. (Dkt. #380, Zaccari Cross-Exam., Tr. Vol. 2, 234:3-6; Dkt. #381, Zaccari Cross-Exam., Tr. Vol. 3, 73:14-75:5).

Discovery confirmed the presence of all Defendants at numerous meetings with Zaccari, the only purpose of which was to discuss expelling Barnes. Some, like Keppler and Mast, offered suggestions, such as looking to see if Barnes could be withdrawn for other reasons. (Dkt. #231-24, Farmer Meeting Notes, Ex. 30; Dkt. #234, Barnes Consol. Reply at 40). Gaskins drafted the withdrawal notice and assisted Zaccari with his response to the Board of Regents.[17] McMillan provided privileged information that Zaccari continued to rely on through the trial on damages.[18] At trial, Zaccari claimed he conferred widely about the expulsion

---

[17] Dkt. #179-1, Barnes SJ Br., SUF ¶¶ 59, 103. In his post-trial motion on qualified immunity, Zaccari continued to maintain that Gaskins did not really disagree with his decision and that she confirmed that he faced an "unprecedented" situation. Dkt. #370 at 4-5.

[18] *See* Dkt. #187, McMillan Dep. 17:21-22; *id*. 17:22-23; *id*. 17:24-18:6. Zaccari's trial testimony included various claims that he based his decision on patient confidences that McMillan shared with him. Dkt. #380, Zaccari Direct Test., Tr. Vol. 2, 199:10-13, 221:12-23.

and that he had a "consensus."  (*See* Dkt. #381, Zaccari Cross-Exam., Tr. Vol. 3, 74:3-5 ("[i]t was a collective decision that that's the way we were to proceed")).

Whether or not the other Defendants agreed with the particular method Zaccari chose to dispose of Barnes is not the relevant question.[19]  Plaintiff provided evidence that each Defendant provided support for Zaccari's actions in his or her own way.  (*See* Dkt. #179-2, Barnes SJ Br. at 70-75).  Although the District Court suggested that "omissions or lack of action" were not sufficient bases for claims against Defendants Keppler and Mast (Dkt. #405, Order at 40, 42), the record showed affirmative acts by both Defendants to support Zaccari's efforts to remove Barnes.[20]  As this Court observed, "[c]ollectively...the group agreed that Barnes should be withdrawn."  *Zaccari*, 669 F.3d at 1301.  But even if the forgoing evidence of a group decision to expel Barnes was not sufficient to establish liability, it cannot be said that the claims were frivolous.  *Sullivan*, 773 F.2d at 1189.

---

[19] The District Court notes that Defendant McMillan voiced opposition to Barnes' expulsion, Dkt. #405, Order at 28, but does not address the fact that she shared medical information with Zaccari without a release, even though she understood his concerns to be about Barnes' protest activities.

[20] Keppler suggested using an academic withdrawal.  Dkt. #231-24, Farmer Meeting Notes, Ex. 30.  Zaccari claimed that Mast provided him with Barnes' Facebook.com collage, Dkt. #179-24, Barnes SJ Br., Ex. 5, gathered other background information on Barnes, and suggested that the student could be withdrawn for making a veiled threat.  Dkt. #234, Barnes Consol. Reply at 40.

This Court has identified several factors to consider when determining whether a claim is frivolous, including "whether the plaintiff established a *prima facie* case," "whether the defendant offered to settle," and "whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Sullivan*, 773 F.2d at 1189. Courts in this Circuit also consider the attention given to the claim because a claim is not frivolous when it is "meritorious enough to receive careful attention and review." *Busby v. City of Orlando*, 931 F.2d 764, 787 (11th Cir. 1991). These factors do not support the District Court's award of reverse fees.

Barnes provided substantial evidence in support of each of his claims. In cases where there has been a finding of frivolity, "the plaintiffs did not introduce any evidence to support their claims." *Sullivan*, 773 at 1189. That is far from the situation here. The District Court's finding that Barnes failed to assert *prima facie* cases for his claims against the Defendants was erroneous and failed to meet its task to "focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Id.* at 1189 (quoting *Jones*, 656 F.2d at 1145).

Moreover, Barnes' case was sufficiently meritorious to receive careful attention. *See Busby*, 931 F.2d at 787. The District Court erroneously assumed that claims are frivolous if they are "exceedingly weak" or based on "speculation," but that is not the proper standard, *see Wigfall*, 2013 WL 5302684, at *2-3 & n.4;

44

*see Cordoba*, 419 F.3d at 1181, and is not accurate here in any event.  Judge

Lawson concluded, without explanation, that the claims against prevailing

Defendants "did not warrant any extended review," (*e.g.*, Dkt. #405, Order at 42),

but this is belied by the Northern District's 30-page opinion on the motion to

dismiss and its 57-page opinion on the cross-motions for summary judgment.

Even where allegations are properly dismissed for failure to state a claim, they are

not meritless or groundless where they receive such careful consideration.  *Hughes*

*v. Rowe*, 449 U.S. 5, 15-16 (1980) (*per curiam*); *Cohen v. World Omni Fin. Corp.*,

457 F. App'x 822, 827 (11th Cir. 2012).

    The District Court's analysis of the "settlement" factor is simply confusing.

Typically, a settlement offer is taken as an indication that the claim was not

frivolous, *Sullivan*, 773 F.2d at 1189, and in this case, the VSU Defendants

(including Zaccari) and BOR served a Rule 68 Offer of Judgment on April 4, 2008,

of $5,000.00 and the reimbursement of statutory costs and reasonable attorney's

fees incurred to that point.  (Dkt. #367-1, Barnes Br. for Attorney's Fees at 6).  The

Court dismissively referred to this as "hardly...a serious settlement negotiation,"

and yet penalized Barnes in the end because "[t]his case should have been settled

long ago." (Dkt. #405, Order at 35, 69 n.16).  Indeed it should have, but settlement

is exceedingly difficult to accomplish when the negotiations are entirely one-sided.

In this circumstance, the settlement factor should not be weighed against the Plaintiff.

### C.    The District Court Awarded Excessive Fees

Even if reverse fees had been justified, the trial court erred by awarding excessive fees to the Defendants.  The District Court's decision to grant fees for the defense of Defendants Mast, Keppler, and the BOR – who are all represented by shared counsel with Defendant Zaccari – had the effect of erroneously awarding fees for Zaccari's defense.  The Supreme Court recently made it clear that, to whatever extent a defendant may qualify for fees, the amount is limited solely to time expended just on the frivolous claims.  *Fox*, 131 S. Ct. at 2215.  However, to the extent the defendant would have incurred the legal expenses anyway in defending against non-frivolous claims, "then a court has no basis for transferring the expense to the plaintiff."  *Id*.  In this case, where the different claims all arose from the same operative facts, and all the same discovery would have been conducted, "the defendant would have incurred the expense in any event" and thus "has suffered no incremental harm from the frivolous claim."  *Id*.

The District Court tried to account for this by reducing the fee award to Zaccari's (and the other VSU Defendants') counsel by 33 percent, as if the work incurred by Zaccari only amounted to one-third of the time devoted to the overall defense.  (Dkt. #405, Order at 46).  But this use of a mathematical formula is both

inappropriate and inconsistent with the record.  The briefs for Zaccari and the other VSU Defendants focus almost entirely on attempted justifications of Zaccari's actions, with treatment of the other Defendants added almost as an afterthought.[21] Even if Zaccari had been the only defendant from the beginning, the amount of work would have been virtually the same.  All of the other VSU Defendants were material witnesses and would have been deposed in any event, because their testimony was necessary to undermine Zaccari's pretextual claims of a threat.

Overall, the District Court's reverse fee award seems to be best explained by the frustration expressed in footnote 16 at the end of the opinion.  The award appears to have been used more as a vehicle to reach a given result, and is not supported by the facts or the law as explained above.  One indication of this is the Court's willingness to award McMillan's counsel fees for more than twice as many hours as those billed by counsel for Gaskins.  Without explanation, the Court deemed the two wildly divergent claims to be "reasonable," yet they were for essentially the same work.[22]  Although the District Court's determination of

---

[21] Dkt. #177-2, VSU Defs. SJ Br. at 31 (no analysis of Mast or Keppler's liability until p. 31); Dkt. #235, VSU Defs. Reply in Support of SJ Br. at 3 (subject heading "Different Conclusions After the Fact Do Not Render Zaccari's Decision Unworthy of Qualified Immunity").

[22] McMillan's counsel claimed 1,020.90 hours, while Gaskins' counsel claimed 470.20 hours.  Dkt. #405, Order at 30, 36.  Each represented only a single party and filed roughly the same pleadings, yet no explanation was ever offered for the starkly different claims.

reasonable fees is entitled to deference, it still must provide some explanation of its reasoning and follow the law of this Circuit. *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 678 F.3d 1199, 1201 (11th Cir. 2012) (abuse of discretion occurs "when neither the district court's decision nor the record provide sufficient explanation to enable meaningful appellate review"). The District Court's failure to explain the discrepancy in the claims is reversible error.

## III. THE DISTRICT COURT ERRED BY REFUSING TO GRANT COMPENSATORY ATTORNEY FEES SOUGHT BY PLAINTIFF

### A. Plaintiff Filed a Fully Supported Fee Petition

The Plaintiff shares the District Court's concern that this case required far too much time and effort and that the constitutional violations committed against Barnes were glaringly obvious. (Dkt. #405, Order at 68 n.16). But that is not the same as saying this has been an easy case. The Defendants pursued a strategy of falsely branding Plaintiff a dangerous psychopath, and trying to introduce evidence from his entire counseling history beginning with adolescence. Substantial time and effort were required to address Defendant's pretextual claims that he faced a "threat," and this strategy extended into the post-trial period.[23] Barnes thus had to

---

[23] In this regard, Plaintiff should have been awarded his full attorney's fees on hours billed on Zaccari's Interlocutory Appeal (427.35); Post-Appeal Proceedings (761.40); Jury Trial on Damages (198.60); and Motion for Judgment (105.00). Dkt. #402, Barnes Suppl. Br. in Support of Mot. for Fees at 6.

48

choose between litigating the case to its end and dealing with all the superfluous issues, or simply "going away," to borrow Zaccari's pithy phrase.

The result was an unnecessarily expensive case.[24]  It was expensive largely because Defendants steadfastly refused to engage in any serious settlement negotiations and instead pursued a strategy that sought to excuse Zaccari's obvious constitutional transgressions by impugning Barnes' character and mental state.  In a case such as this, the law is clear that where a defendant's litigation strategy was "stubborn and contentious," and "largely responsible for the long duration of the litigation and mounting attorneys fees," prevailing plaintiff's attorneys should be fully compensated.  *Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*, 442 F.3d 1283, 1290 (11th Cir. 2006).  *See also Hart v. Bourque*, 798 F.2d 519, 520 (1st Cir. 1986) (Court should consider that "much of the complexity was unnecessary, and of [Defendants'] own making").  Barnes actively pursued settlement discussions at each stage of this case, but was rebuffed each time.  His claim for fees should not suffer because of that.  *Atlanta Journal*, 442 F.3d at 1290.

After prevailing at trial, the Plaintiff submitted a fully documented fee petition, supported by billing statements, affidavits and legal analysis.  (Dkt. #367-

---

[24] In total, counsel for Barnes requested an award of $1,883,412 in fees, and $76,229.93 in expenses to be allocated among the participating law firms, and $2,918.44 for out-of-pocket expenses incurred directly by Plaintiff.  Dkt. #402, Barnes Suppl. Br. in Support of Mot. for Fees at 5-8.

1).  Plaintiff's counsel reduced by almost forty percent the number of hours recorded, to delete charges for unsuccessful claims, and to exercise sound billing judgment.  (*Id.* at 15).  As the District Court acknowledged, "a vast number of hours were cut," and "the attorneys have exercised appropriate billing judgment," such that "the hours claimed by Barnes' attorneys are appropriate."[25]

Nevertheless, and despite the basic law that a prevailing plaintiff should receive a "fully compensatory fee," *Hensley*, 461 U.S. at 435, the Court issued an order that all but negated any award of fees.  In part, this was because of the inappropriate award of reverse fees, as addressed above.  But it also resulted from the Court's manifest frustration with the overall amount of time and effort expended,[26] which it expressed by (1) imposing an across-the-board reduction of ***an additional sixty percent*** in the award, purported to account for diminished success; (2) giving no weight to the public benefit of a ruling on an important matter of constitutional law; and (3) applying a lowered hourly rate.  These reductions were excessive, erroneous, and unsupported by law.

---

[25] Dkt. #405, Order at 53-54.  Based on the hours found to be reasonable, the Court approved fees based on the lodestar approach totaling $1,012,587.25.  *Id.* at 55.  This total was predicated on diminished hourly rates, which Plaintiff disputes.

[26] Dkt. #405, Order at 68 n.16 ("I have no way of knowing just what the attorneys and paralegals did with their time…").  With due respect to the District Court, the amount of time spent (and its value in fees) was broken down by stage of litigation and set forth in tables submitted as part of the fee petition.  Dkt. #367-1 at 22-23.  Additionally, detailed billing records were submitted.  Dkt. #367-7.

50

### B.    The District Court Erroneously Discounted Plaintiff's Fee Award

#### 1.    The Across-the-Board Fee Reduction is Excessive and Ignores to Public Benefit of the Judgment

The District Court found the number of hours claimed by Plaintiff's counsel reasonable for purposes of calculating the lodestar, yet sharply reduced the award because only one of six original claims was successful, because of the disparity between the award and fee demand, and because the amount of the recovery was lower than originally sought.  (Dkt. #405, Order at 58-61).  A District Court has discretion to apply equitable considerations (such as the level of success), in determining the amount of fees, but that discretion must be exercised pursuant to the considerations the Supreme Court has established.  *Hensley*, 461 U.S. at 437.

Here, the across-the-board reduction ignored important factors the Supreme Court has identified.  Most importantly, the District Court's analysis of successful versus unsuccessful claims used an approach that the Supreme Court has expressly rejected, of comparing the total number of issues in the case with those actually prevailed upon.  *Hensley*, 461 U.S. at 435.  That is particularly inappropriate here, where the claims are based on a "common core of facts" and, in most instances, "related legal theories."  *Id*.

Equally as important, Judge Lawson overlooked that the lodestar already accounted for unsuccessful claims.  Although the District Court acknowledged the massive fee reductions and found them reasonable, the decision below failed to

recognize that the reduced hours resulted from writing off time for unsuccessful claims. (*See* Dkt. #367-5, Corn-Revere Decl. ¶¶ 17-19 (describing exercise of billing judgment as well as deletion of time spent on unsuccessful claims); Dkt. #367-7 (exhibit showing billing deletions)). The imposition of a further across-the-board cut thus double-counts this deduction. Applying both hour-by-hour reductions as well as an across-the-board cut in the fee is reversible error. *Bivins v. Wrap it Up, Inc.*, 548 F.3d 1348, 1351-52 (11th Cir. 2008) ("[W]e ensure that the district court does not doubly-discount the requested hours, as was the case here,").

The deduction for the amount of the recovery (thus far) also is erroneous, whether measured by the initial claim for damages or in relation to the amount of fees. Comparing the amount of recovery to the incurred fees is not an "equitable" deduction to the extent Defendants are responsible for prolonging the litigation. *Atlanta Journal*, 442 F.3d at 1290. Regardless of the magnitude of recovery, it would only encourage civil rights defendants to eschew settlement and engage in obstructionist behavior if doing so allowed the use of such tactics to reduce exposure to fee awards.[27]

---

[27] Additionally, the District Court's calculation of fees based on the award amount obviously will have to be redone if this Court reverses the decision below on the First Amendment claim, raising the possibility of a further compensatory award, punitive damages, and equitable relief.

52

More troubling, however, is the District Court's unwillingness to give any credit for the public benefit of the existing award. The Court acknowledged that the fee petition was supported by declarations from experts that identified the finding of personal liability against President Zaccari as "one of the most important decisions for student conduct administration in the past 25 years."[28] Although it purported to have taken these declarations into consideration, the District Court without explanation reverted to the very mathematical formula for assessing success that the Supreme Court rejected in *Hensley*. (Dkt. #405, Order at 58). This back-of-the-hand to the evidentiary record, and the District Court's assumption that this was a garden-variety case that will have little impact, (*id.* at 68 n.16), is clearly erroneous.

The vindication of a constitutional right and the judgment's national impact is "an important measure of success" that must be taken into account in calculating fees. *Atlanta Journal*, 442 F.3d at 1290. Contrary to the District Court's mathematical measurement of success, the importance of a civil rights verdict "is measured differently than success in a private tort claim." *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1305 (11th Cir. 2001). "[W]hen determining the

---

[28] Dkt. #405, Order at 57-58. *See also* Dkt. #367-3, Lukianoff Decl. ¶ 7; Dkt. #367-4, O'Neil Decl. ¶ 7 ("The court's decision in this case to impose personal liability on a state university president is unusual, and it will have an important deterrent effect on any similar disregard of basic due process rights by others within the higher education community.").

degree of success obtained by a civil rights plaintiff, a court must be careful not to place 'undue emphasis on the modest money damages that were found by the jury' because successful civil rights actions vindicate a public interest."  *Id*. at 1306 (quoting *Williams v. Thomas*, 692 F.2d 1032, 1038 (5th Cir. 1982)).  Doing so compromises the policies underlying Section 1988.  *Thomas*, 692 F.2d at 1038.

The affirmation of constitutional principles "produces an undoubted public benefit that courts ***must consider*** in awarding attorneys' fees under Section 1988." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th 1987) (emphasis added). Through Section 1988, Congress elected "to encourage meritorious civil rights claims because of the benefits of such litigation for the named plaintiff and for society at large, irrespective of whether the action seeks monetary damages." *Blanchard v. Bergeron*, 489 U.S. 87 (1989).  Accordingly, using an award-based mathematical measure of success is antithetical to Section 1988's objectives.  In a case such as this, "vindicating a constitutional right against a [governmental] defendant heightens the public benefit created by a lawsuit," and a court must account for this distinct measure to be consistent with the purpose of Section 1988. *Villano*, 254 F.3d at 1307.  Here, the District Court failed to do so.

## 2.     The District Court Applied the Wrong Hourly Rate

The District Court's decision to impose a maximum hourly rate of $315 based on rates for the Atlanta legal services market is clearly erroneous because it

54

ignores record evidence that the Court itself requested.   Plaintiff's counsel submitted a fee petition in which it asked the Court to apply the prevailing rates of Washington, D.C. for lead counsel, and Atlanta rates for local counsel.  (Dkt. #367-1 at 15-21).  The District Court decided that the prevailing rate for Atlanta was applicable for all counsel (not Washington, D.C. or Valdosta), and directed the parties to submit supplemental briefs to substantiate the current rate.

Barnes complied with this Order, and submitted evidence showing that rates for legal services in Atlanta for firms of comparable size were not different from rates charged in Washington, D.C.  (Dkt. #402 at 3-5).  The supplemental brief was supported by both local press accounts and a Declaration of Michael J. Bowers, former Attorney General of the State of Georgia, and partner in the Atlanta firm Balch & Bingham LLP.  Among other things, the Bowers Declaration provided examples of local rates that corresponded to D.C. rates and affirmed that, "[i]n my opinion, the counsels' rates in this case fall well within the range of rates [in Atlanta] based on my experience."  (Dkt. #402-1 at ¶ 5).

The District Court did not consider this evidence or published information about the billing rates at comparable Atlanta firms, and, without explanation, other than to state that the rates for Washington, D.C.-based counsel were "excessive," reduced the hourly rates for D.C. counsel by thirty to fifty percent.  (Dkt. #405, Order at 52).  However, the District Court cannot simply substitute its judgment for

uncontradicted evidence without an explanation or record support. *NAACP v. City of Evergreen*, 812 F.2d 1332, 1334, 1336 (11th Cir. 1987). It was reversible error for the District Court to request evidence on the applicable Atlanta rate, then to ignore it without providing a sufficient explanation. *Cf. Bivins*, 548 F.3d at 1351 ("Any reductions to the requested hours must be concisely and clearly explained to allow for appellate review; otherwise, we must remand.").

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's disposal of Barnes' First Amendment retaliation claim on summary judgment, and direct it to issue instead an order finding a violation of his First Amendment rights, and to conduct further proceedings to award damages and injunctive relief. This Court also should reverse the District Court's fee order by ordering the award of fully compensatory attorney's fees to Plaintiff and by vacating the award of reverse fees to the Defendants.

Respectfully submitted,

_____
Robert Corn-Revere
Ronald G. London
Lisa Zycherman
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C.  20006-3401
(202) 973-4200

Cary Wiggins
Georgia Bar #757657
Wiggins Law Group
260 Peachtree Street, N.W., Suite 401
Atlanta, Georgia 30303
(404) 659-2880

Counsel for Appellant

Dated: December 9, 2013

## CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to Fed. R. App. P.  32(a)(5)(A), the foregoing Opening Brief of Appellant, was typed using Times New Roman 14-point font.  I also certify that pursuant to Fed. R. App. P. 32(7)(B)(i) and 32(7)(C), the foregoing brief contains 13,443 words, not counting the certificate of interested persons, statement regarding oral argument, table of contents, table of authorities, certificate of compliance, and certificate of service according to the word processing system used to prepare this brief.

_____
Robert Corn-Revere
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C.  20006-3401
(202) 973-4200
bobcornrevere@dwt.com

Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2013, I served the foregoing Brief of

Appellant via U.S. mail and electronic means to:


David C. Will
Holly Hance
Royal – Will
4799 Sugarloaf Parkway, Bldg. J
Lawrenceville, GA  30044

David R. Smith
Brannen, Searcy & Smith, LLP
22 E. 34th Street
Savannah, GA  31419

Matthew R. LaVallee
Daley, Koster & LaVallee, LLC
2849 Paces Ferry Road – Suite 205
Atlanta, GA  30339


_____
Robert Corn-Revere
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C.  20006-3401
(202) 973-4200
bobcornrevere@dwt.com

Counsel for Appellant