No. 13–13800

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

THOMAS HAYDEN BARNES,

*Plaintiff-Appellant*,

v.

RONALD M. ZACCARI,
BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Middle District of Georgia, Valdosta Division

**BRIEF *AMICI CURIAE* OF
FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION,
AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA,
AMERICAN COUNCIL OF TRUSTEES AND ALUMNI, CATO
INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, INDIVIDUAL
RIGHTS FOUNDATION, NATIONAL COALITION AGAINST
CENSORSHIP, REASON FOUNDATION, SOUTHEASTERN LEGAL
FOUNDATION, STUDENTS FOR LIBERTY, STUDENT PRESS LAW
CENTER
IN SUPPORT OF APPELLANT AND SEEKING REVERSAL**

Lawrence G. Walters
Walters Law Group
195 W. Pine Ave.
Longwood, FL 32750
(407) 975-9150
*Counsel for Amici Curiae,
Foundation for Individual Rights in
Education, et al.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certify that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amici*.

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Eleventh Circuit Rule 26.1-1, counsel for *amici* verify that the persons listed below have or may have an interest in the outcome of this case:

1.      American Booksellers Foundation for Free Expression: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

2.      American Civil Liberties Union Foundation of Georgia: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

3.      American Council of Trustees and Alumni: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

4.      Barnes, Thomas Hayden: Plaintiff-Appellant.

5.      Board of Regents of the University System of Georgia: Defendant-Appellee.

6.      Brannen, Searcy & Smith, LLP: Law firm for Defendant-Appellee Laverne Gaskins.

7.      Cato Institute: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

8.      Corn-Revere, Robert: Lead counsel for Plaintiff-Appellant Thomas Hayden Barnes.

9.    Daley, Koster & LaVallee, LLC: Law firm for Defendant-Appellee Leah McMillan.

10.   Davis Wright Tremaine, LLP: Law firm for Plaintiff-Appellant Thomas Hayden Barnes.

11.   Electronic Frontier Foundation: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

12.   Fedeli, Christopher A.: Counsel for Plaintiff-Appellant Thomas Hayden Barnes.

13.   Foundation for Individual Rights in Education: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

14.   Gaskins, Laverne: Defendant-Appellee.

15.   Georgia Department of Administrative Services.

16.   Hance, Holly: Counsel for Defendants-Appellees Ronald M. Zaccari and Board of Regents of the University System of Georgia; counsel for Defendants Kurt Keppler, Russ Mast, Valdosta State University.

17.   Individual Rights Foundation: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

18.   Keppler, Kurt: Defendant.

19.   Koster, Paul: Counsel for Defendant-Appellee Leah McMillan.

20.   LaVallee, Matthew R.: Counsel for Defendant-Appellee Leah McMillan.

21.      Lawson, Honorable Hugh: Senior District Court Judge for the United States District Court for the Middle District of Georgia, Valdosta Division.

22.      London, Ronald G.: Counsel for Plaintiff-Appellant Thomas Hayden Barnes.

23.      Mast, Russ: Defendant-Appellee.

24.      McMillan, Leah: Defendant-Appellee.

25.      Morgan, Victor: Director of Valdosta State University Counseling Center.

26.      National Coalition Against Censorship: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

27.      Pannell, Jr., Honorable Charles A.: District Court Judge for the United States District Court for the Northern District of Georgia, Atlanta Division.

28.      Reason Foundation: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

29.      Royal - Will/David C. Will, P.C.: Law firm for Defendants-Appellees Ronald M. Zaccari and Board of Regents of the University System of Georgia; counsel for Defendants-Appellees Kurt Keppler, Russ Mast, Victor Morgan, Valdosta State University.

30.      Smith, David R.: Counsel for Defendant-Appellee Laverne Gaskins.

31.      Southeastern Legal Foundation: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

32.   Students For Liberty: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

33.   Student Press Law Center: *Amicus Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

34.   Valdosta State University: Defendant.

35.   Walters, Lawrence G.: Counsel for *Amici Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

36.   Walters Law Group: Law firm for *Amici Curiae* in support of Plaintiff-Appellant Thomas Hayden Barnes.

37.   Wiggins, Cary Stephen: Lead counsel for Plaintiff-Appellant Thomas Hayden Barnes.

38.   Wiggins Law Group: Law firm for Plaintiff-Appellant Thomas Hayden Barnes.

39.   Will, David C.: Lead counsel for Defendants-Appellees Ronald M. Zaccari and Board of Regents of the University System of Georgia; Counsel for Defendants-Appellees Kurt Keppler, Russ Mast, Victor Morgan, Valdosta State University.

40.   Zaccari, Ronald M.: Defendant-Appellee.

41.    Zycherman, Lisa Beth: Counsel for Plaintiff-Appellant Thomas Hayden Barnes.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

CERTIFICATE OF INTERESTED PERSONS ............................................ ii

TABLE OF CONTENTS................................................................... vi

TABLE OF AUTHORITIES ..................................................................... viii

INTEREST OF AMICI CURIAE................................................................. 1

STATEMENT OF THE ISSUES................................................................. 2

SUMMARY OF ARGUMENT ................................................................... 3

ARGUMENT ............................................................................................. 5

I.   The Expressive Rights of Public College Students Like Barnes Require
     Protection ............................................................................................ 5

  A.   Despite Decades of Precedent, Student First Amendment Rights Are
       Routinely Violated on Public Campuses Nationwide...................... 6

  B.   Barnes Suffered Retaliation for Expressive Activity Protected by the First
       Amendment ..................................................................................... 12

  C.   Failing to Correct the Erroneous District Court Grant of Summary
       Judgment on Barnes' First Amendment Claim Will Encourage Further
       Abuse of Student First Amendment Rights ................................... 15

II.  By Sharply Reducing Barnes' Attorney's Fees Award, the District Court
     Ignored the Public Benefit Produced by Barnes' Victory and Dangerously
     Discounted the Cost of Violating Student Rights .............................. 17

  A.   In Assessing the Success of Civil Rights Litigation, Courts Must Weigh
       the Public Benefit Secured by the Result........................................ 18

B.   The District Court Erred by Failing to Recognize the Important Public Benefit Obtained by Barnes' Victory .............................................. 20

C.   Allowing the District Court's Discount of Barnes' Award to Stand Would Signal That Student Rights May Be Violated Without Cost. ................................................................................................ 28

CONCLUSION ............................................................................................ 30

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

CASES

*Abella v. Simon*,
    522 F. App'x 872 (11th Cir. 2013)........................................................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242; 106 S. Ct. 2505 (1986) ..................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662; 129 S. Ct. 1937  (2009) ..................................................15

*Bair v. Shippensburg University*,
    280 F. Supp. 2d 357 (M.D. Pa. 2003) ..................................................11

*Barnes v. Zaccari*,
    757 F. Supp. 2d 1313 (N.D. Ga. 2010) ........................................ passim

*Barnes v. Zaccari*,
    No. 7:12-cv-89 (HL) (M.D. Ga. July 24, 2013) ..................................26

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544; 127 S. Ct. 1955 (2007) ..................................................15

*Bennett v. Hendrix*,
    423 F.3d 1247 (11th Cir. 2005) ..................................................... 13, 14

*Booher v. Board of Regents, Northern Kentucky University*,
    1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998) ......................11

*Carey v. Piphus*,
    435 U.S. 247; 98 S. Ct. 1042 (1978) ....................................................21

*College Republicans at San Francisco State University v. Reed*,
    523 F. Supp. 2d 1005 (N.D. Cal. 2007)................................................11

*Dambrot v. Central Michigan University*,
    55 F.3d 1177 (6th Cir. 1995) ...............................................................11

*Davis v. Locke*,
  936 F.2d 1208 (11th Cir. 1991) ............................................................27

*DeJohn v. Temple University*,
  537 F.3d 301 (3d Cir. 2008) ................................................................11

*Dixon v. Alabama State Board of Education*,
  294 F.2d 150 (5th Cir. 1961) ..............................................................21

*Doe v. University of Michigan*,
  721 F. Supp. 852 (E.D. Mich. 1989) ...................................................11

*Georgia Association of Educators v. Gwinnett County Sch. Dist.*,
  856 F.2d 142 (11th Cir. 1988) ............................................................14

*Goss v. Lopez*,
  419 U.S. 565; 95 S. Ct. 729 (1975) .....................................................21

*Healy v. James*,
  408 U.S. 169; 92 S. Ct. 2338 (1972) .....................................................5

*Hensley v. Eckerhart*,
  461 U.S. 424; 103 S. Ct. 1933 (1983) ..................................... 17, 19, 27

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ..............................................................19

*Keyishian v. Board of Regents of the University of New York*,
  385 U.S. 589; 87 S. Ct. 675 (1967) .......................................................6

*Maine v. Thiboutot*,
  448 U.S. 1; 100 S. Ct. 2502 (1980) .....................................................17

*McCauley v. University of the Virgin Islands*,
  618 F.3d 232 (3d Cir. 2010) ................................................................11

*Nash v. Auburn University*,
  812 F.2d 655 (11th Cir. 1987) ............................................................21

*New York Times Co. v. Sullivan*,
  376 U.S. 254, 84 S. Ct. 710 (1964) ....................................................................14

*Newman v. Piggie Park Enterprises, Inc.*,
  390 U.S. 400; 88 S. Ct. 964 (1968) ...................................................................20

*Papish v. Board of Curators of the Univ. of Mo.*,
  410 U.S. 667, 93 S. Ct. 1197 (1973) .................................................................14

*Popham v. City of Kennesaw*,
  820 F.2d 1570 (11th Cir. 1987) ................................................................. 20, 25

*Randall v. Scott*,
  610 F.3d 701 (11th Cir. 2010) ...........................................................................15

*Riverside v. Rivera*,
  477 U.S. 561; 106 S. Ct. 2686 (1986) ..................................................... 19, 20, 27

*Roberts v. Haragan*,
  346 F. Supp. 2d 853 (N.D. Tex. 2004) ...............................................................11

*Rosenberger v. Rector and Visitors of the University of Virginia*,
  515 U.S. 819; 115 S. Ct. 2510 (1995) .................................................................6

*Shelton v. Tucker*,
  364 U.S. 479; 81 S. Ct. 247 (1960) .....................................................................5

*Smith v. Tarrant County College District*,
  694 F. Supp. 2d 610 (N.D. Tex. 2010) ...............................................................11

*Suarez Corp. Indus. v. McGraw*,
  202 F.3d 676 (4th Cir. 2000) .............................................................................13

*Sweezy v. New Hampshire*,
  354 U.S. 234; 77 S. Ct. 1203 (1957) ...................................................... 3, 6, 12, 29

*The UWM Post, Inc. v. Board of Regents of the University of Wisconsin System*,
  774 F. Supp. 1163 (E.D. Wis. 1991) ..................................................................11

x

*Van Tuinen v. Yosemite Cmty. Coll. Dist.*,
  No. 1:13-at-00729 (E.D. Cal. filed Oct. 10, 2013)................................................7

*Villano v. City of Boynton Beach*,
  254 F.3d 1302 (11th Cir. 2001)............................................................ 19, 27, 28

*Young Americans for Liberty v. Williams*,
  No.1:12-cv-155, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio June 12, 2012).10, 11

STATUTES

42 U.S.C. § 1988.....................................................................................................17

OTHER AUTHORITIES

Allan L. Shackelford, *'Personal liability' should be wake-up call for presidents,
  senior administrators*,
  Campus Legal Advisor, Dec. 2010 ..................................................................24

Andrew Kloster, *Speech Codes Slipping Past the Schoolhouse Gate: Current
  Issues in Students' Rights*, 81 UMKC L. Rev. 617 (2013) ..................................23

Andy Guess, *Maybe He Shouldn't Have Spoken His Mind*, Inside Higher Ed (Jan.
  11, 2008).............................................................................................................22

Angus Johnston, *Expelled Student Activist Wins $50K Court Judgment Against
  University President*, Student Activism (Feb. 4, 2013)....................................23

Armand Derfner, *Background and Origin of the Civil Rights Attorney's Fee
  Awards Act of 1976*, 37 Urb. Law. 653 (2005) ..................................................17

Azhar Majeed, *Putting Their Money Where Their Mouth Is: The Case for Denying
  Qualified Immunity to University Administrators for Denying Students' Speech
  Rights*,
  8 Cardozo Pub. L. Pol'y & Ethics J. 515 (2010) .............................................23

Barry Petchesky, *University Suspends Journalism Student For Asking Questions
  For A Class Assignment*, Gawker
  (Nov. 10, 2012, 12:05 PM).....................................................................................8

Brandon Larrabee, *Valdosta State student sues after he's expelled*, ATHENS
    BANNER-HERALD, Jan. 12, 2008..........................................................................22

Bruce Thornton, *College: Where Free Speech Goes to Die*,
    REALCLEARPOLITICS (Mar. 4, 2013)....................................................................23

Chris Chiego, *Expulsion for protest unfair*,
    RED & BLACK (University of Georgia), Jan. 17, 2008 .......................................22

Darryn Cathryn Beckstrom, Comment, *Who's Looking at Your Facebook Profile?*
    *The Use of Student Conduct Codes to Censor College Students' Online Speech*,
    45 WILLAMETTE L. REV. 261 (2008) ....................................................................23

ECF No. 367-4, Declaration of Robert M. O'Neil ..................................................25

Elizabeth Bernstein, *Schools Struggle With Dark Writings*,
    WALL ST. J., May 20, 2008 ..................................................................................22

Eric A. Hoffman, Note & Comment, *Taking a Bullet: Are Colleges Exposing*
    *Themselves to Tort Liability By Attempting to Save Their Students?*,
    29 GA. ST. U.L. REV. 539 .....................................................................................23

ERIC L. DEY, MOLLY C. OTT, MARY ANTONAROS, CASSIE L. BARNHARDT &
    MATTHEW A. HOLSAPPLE, ENGAGING DIVERSE VIEWPOINTS: WHAT IS THE
    CAMPUS CLIMATE FOR PERSPECTIVE-TAKING? (Washington, D.C.: Association of
    American Colleges and Universities, 2010)........................................................12

George Leef, *Crushing Defeat for Valdosta Administrator*,
    NAT'L REV. ONLINE (Feb. 7, 2013, 12:53 PM) ...................................................23

Glenn Coin, *How an email to three college coaches led to a near suspension for*
    *SUNY Oswego student*, SYRACUSE ONLINE (Nov. 13, 2012, 8:24 AM)................9

Glenn Coin, *SUNY Oswego president "heart sick" over case of student suspended*
    *for misrepresentation*,
    SYRACUSE ONLINE (Nov. 16, 2012, 3:23 PM)........................................................9

Greg Lukianoff, *Breaking: Federal Jury Finds College President Personally*
    *Liable in 'Facebook Collage' Case*,
    HUFFINGTON POST (Feb. 1, 2013, 4:20 PM)..........................................................23

Greg Lukianoff, *Campus Clampdowns on Free Speech Flunk Their Legal Tests*, WALL ST. J., Feb. 16, 2013 ...................................................................22

Greg Lukianoff, UNLEARNING LIBERTY: CAMPUS CENSORSHIP AND THE END OF AMERICAN DEBATE (2012) ...................................................................10

H. R. REP. NO. 94-1558 (1976) ...................................................... 17, 20

John Wesley Lowery, *25 Years of Legislation and Litigation Impacting Student Conduct Administration*, https://sites.google.com/site/drjohnwesleylowery/home/2013-asca-conference/25yearsoflegislationandlitigationimpactingstudentconductadministrat ion .......................................................................................................24

John Wesley Lowery, *Biography*, https://sites.google.com/site/drjohnwesleylowery ..............................................................................................................25

Justin Heck, *Counter-protesters were told to stop handing out fliers, student says*, CRIMSON WHITE, Apr. 17, 2013 ...........................................................8

Letter from Peter Bonilla to State University of New York at Oswego President Deborah F. Stanley, Oct. 26, 2012 .......................................................9

Mary Beth Marklein*, Students' rights weighed as colleges try to assess threats*, USA TODAY, Jan. 14, 2011..................................................................22

Maureen Downey, *Court rules for ousted student and against former president in Valdosta State University case*, ATLANTA J.-CONST. (Sept. 8, 2010, 3:31 PM) ..22

Melissa Brown, *University of Alabama doesn't respond to calls for policy revision following abortion debate*, AL.COM (July 5, 2013, 11:59 AM)............................8

Nan Austin, *MJC halt of Constitution handout lands on YouTube*, MODESTO BEE, Sep. 19, 2013 .........................................................................................7

Nan Austin, *MJC student files freedom of speech lawsuit against college*, MODESTO BEE, Oct. 10, 2013 ................................................................7

Nico Perrino, *Universities: where you go to learn—and be monitored*, GUARDIAN (Oct. 22, 2013)........................................................................................22

Peter Bonilla, *The Crimson Tide Rolls — Right Over Pro-Choice Students' Rights*, POLICYMIC (July 10, 2013) ...................................................................................7

*President Personally Liable for Student's Expulsion, Jury Says*, INSIDE HIGHER ED (Feb. 5, 2013)........................................................................................23

Quinten Plummer, *Federal jury returns Zaccari verdict*, VALDOSTA DAILY TIMES, Feb. 2, 2013 ...........................................................................................22

Rachel Moran, Unlearning Liberty*: Censorship on College Campuses*, REASON (Oct. 26, 2012, 3:00 PM)........................................................................23

S. REP. NO. 94-1011 (1976) ......................................................................17

S.D. Lawrence, *U Cincinnati Free Speech Restrictions Struck Down in Court*, EDUC. NEWS (June 19, 2012)..................................................................10

Sara Lipka, *Federal Judge Finds Former College President Personally Liable in Student-Conduct Case*, CHRON. OF HIGHER EDUC., Sep. 7, 2010 ........................23

Will Lewis, *Jury reaches verdict on Zaccari trial*, VALDOSTA ST. U. SPECTATOR, Feb. 7, 2013 ...........................................................................................22

William Creeley, *Journalism Student Suspended for Offending Hockey Coaches*, HUFFINGTON POST (Nov. 14, 2012, 11:06 AM) ......................................................9

**Rules**

Fed. R. Civ. P. 8(a)(2).............................................................................15

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* represent a broad coalition of organizations from across the political and ideological spectrum united by a common belief in the importance of promoting and protecting constitutional rights, including the rights to freedom of expression and due process of law enjoyed by our nation's public college students.[2] This case is of deep concern to *amici*. Despite the clarity of the jurisprudence governing their rights, students continue to suffer from censorship and unjust punishment, as did Hayden Barnes. *Amici* believe that to safeguard student civil liberties, courts must hold public university administrators accountable for their unconstitutional actions and properly assess the public benefits of litigation vindicating those rights.

---

[1] Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure, counsel for *amici* states that no counsel for a party authored this brief in whole or in part and no person, other than *amici*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief. Plaintiff-Appellant consents to the filing of this brief; some, but not all, Defendants-Appellees consent to the filing of this brief. Consistent with FRAP 29, *amici* have thus filed a motion accompanying this brief seeking leave from this Court to file.

[2] A full statement of interest for each *amici* is included with the Motion for Leave to File accompanying this brief.

1

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in granting defendants summary judgment on Barnes' First Amendment claim by relying on an unreasonably narrow interpretation of Barnes' complaint and holding that Barnes had alleged a conspiracy?

2.      Whether the district court erred in sharply reducing Barnes' attorney's fees award, in light of the public benefit of successful civil rights litigation vindicating student civil liberties?

## SUMMARY OF ARGUMENT

More than a half-century ago, the Supreme Court eloquently expressed the importance of protecting constitutional rights on our nation's public university campuses. "The essentiality of freedom in the community of American universities is almost self-evident," the Court observed. *Sweezy v. New Hampshire*, 354 U.S. 234, 250; 77 S. Ct. 1203, 1211 (1957). "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id*. at 250; at 1212.

But despite this sterling statement, reaffirmed by decades of precedent, students like Hayden Barnes continue to find their constitutional rights to freedom of expression and due process violated on campuses nationwide. Too often, public university administrators censor student speech protected by the First Amendment simply because it is dissenting, unpopular, or merely inconvenient—just as former Valdosta State University President Ronald Zaccari did in the case now before this Court. Time and again, students suffer serious disciplinary consequences for having the temerity to speak their minds on campus—and time and again, they are denied basic due process protections when facing suspension and expulsion for doing so. Zaccari's expulsion of Barnes is a textbook example of First Amendment

3

retaliation. This Court must overturn the district court's strained reading of Barnes' retaliation claim to reestablish the primacy of the First Amendment on campus—because sadly, Hayden Barnes' case is no anomaly.

But while the harm suffered by Barnes is common, Barnes himself is not. Expelled without a hearing for exercising his First Amendment rights, Barnes fought back. With the aid of skilled counsel, Barnes has vindicated his constitutional right to due process, securing a landmark victory that has echoed throughout higher education. Hailed by experts as one of the most important student conduct cases of the past quarter-century, Barnes' widely covered win will have a powerful deterrent effect in years to come.

The public benefit of Barnes' victory is precisely the excellent result Congress sought in passing the Civil Rights Attorney's Fees Award Act. Nevertheless, the district court sharply reduced Barnes' reasonable attorney's fees award. If this result is allowed to stand, the cost of censoring and expelling students in violation of long-established constitutional rights will be lowered, and the expense of vindicating these liberties increased, harming both public higher education and the health of our democracy.

## ARGUMENT

### I.  The Expressive Rights of Public College Students Like Barnes Require Protection.

The Supreme Court has long held that students do not sacrifice their constitutional rights when they enroll at public colleges. Justice Powell wrote more than forty years ago that "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180; 92 S. Ct. 2338, 2346 (1972). The Court has not only clarified that public college students are entitled to full expressive rights, but has emphasized the importance of safeguarding these rights. *See Shelton v. Tucker*, 364 U.S. 479, 487; 81 S. Ct. 247, 251 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

Nevertheless, violations of students' speech rights are alarmingly commonplace. In fourteen years of defending campus civil liberties, *amicus* FIRE has encountered countless instances of administrators brazenly violating the rights of their students. This case is a particularly egregious example of such disregard and thus presents this Court the opportunity to reaffirm that administrators at public colleges may not trample on the constitutional rights of their students.

Should it choose to do so, this Court would send a clear message that such violations have consequences.

### A. Despite Decades of Precedent, Student First Amendment Rights Are Routinely Violated on Public Campuses Nationwide.

The Supreme Court has repeatedly and emphatically affirmed the vital importance of free expression in public higher education. *See*, *e.g.*, *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 836; 115 S. Ct. 2510, 2520 (1995) ("For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses."); *Keyishian v. Board of Regents of the University of New York*, 385 U.S. 589, 603; 87 S. Ct. 675, 683 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'") (internal citation omitted). Recognizing that public universities play a "vital role in a democracy," the Court has observed that silencing the exchange of ideas on campus "would imperil the future of our Nation." *Sweezy*, 354 U.S. at 250; 77 S. Ct. at 1211.

But too often, public college administrators fail to share this respect for students' rights to free expression. In the years since Hayden Barnes was expelled for protesting former Valdosta State University President Ronald Zaccari's plans to

6

construct two parking facilities, censorship of student expression on our nation's public campuses has continued unabated.

In one recent example of many, Modesto Junior College (MJC) student Robert Van Tuinen was prevented from distributing copies of the U.S. Constitution to his fellow students on Constitution Day this past September.[3] Both campus security and an administrator informed Van Tuinen that college policy required him to fill out an application to use the school's "free speech area" at least five days in advance.[4] When the college refused to suspend this unconstitutional policy, Van Tuinen filed a First Amendment lawsuit.[5]

This was not an isolated incident. In April 2013, the University of Alabama (UA) threatened to arrest members of a pro-choice student group who sought to distribute fliers near a pro-life rally to provide an alternative view.[6] Having learned about the pro-life group's event the day before it was to occur, the pro-choice

---

[3] Nan Austin, *MJC halt of Constitution handout lands on YouTube*, MODESTO BEE, Sep. 19, 2013, *available at* http://www.modbee.com/2013/09/19/2930225/mjc-halt-of-constitution-handout.html.

[4] *See* Nan Austin, *MJC student files freedom of speech lawsuit against college*, MODESTO BEE, Oct. 10, 2013, *available at* http://www.modbee.com/2013/10/10/2968629/mjc-student-files-freedom-of-speech.html.

[5] *Van Tuinen v. Yosemite Cmty. Coll. Dist.*, No. 1:13-at-00729 (E.D. Cal. filed Oct. 10, 2013).

[6] *See* Peter Bonilla, *The Crimson Tide Rolls — Right Over Pro-Choice Students' Rights*, POLICYMIC (July 10, 2013), http://www.policymic.com/articles/53821/the-crimson-tide-rolls-right-over-pro-choice-students-rights.

students applied for the mandatory "ground use permit."[7] But they were informed by UA administrators that it was impossible to approve their request to engage in expressive activity because they had failed to provide the required notice.[8] While even the pro-life students publicly affirmed the value of the counter-demonstration,[9] UA's instinct and intent was to stifle speech. It succeeded.

Public colleges frequently disregard the First Amendment in seeking to rid campuses of dissenting, unpopular, or simply unwanted speech—particularly when student speakers embarrass university administrators, as did Barnes. *See Barnes v. Zaccari*, 757 F. Supp. 2d 1313, 1317 (N.D. Ga. 2010) ("Zaccari further stated that Barnes had personally embarrassed [Zaccari]."). For example, in October 2012, State University of New York College at Oswego journalism student Alex Myers chose to write about men's hockey coach Ed Gosek for a class assignment, asking rival coaches their opinion of Gosek via email. In reply, Cornell University coach Michael Schaefer told Myers that his request was "offensive."[10] Myers apologized,

---

[7] *See* Justin Heck, *Counter-protesters were told to stop handing out fliers, student says*, CRIMSON WHITE, Apr. 17, 2013, *available at* http://cw.ua.edu/2013/04/17/grounds-use-permit-under-dispute.

[8] *See* Melissa Brown, *University of Alabama doesn't respond to calls for policy revision following abortion debate*, AL.COM (July 5, 2013, 11:59 AM), http://blog.al.com/tuscaloosa/2013/07/university_of_alabama_doesnt_r.html.

[9] *Id.*

[10] Barry Petchesky, *University Suspends Journalism Student For Asking Questions For A Class Assignment*, GAWKER (Nov. 10, 2012, 12:05 PM), http://gawker.com/5959439/university-suspends-journalism-student-for-asking-questions-for-a-class-assignment.

clarifying that he only sought to convey that he was not writing a "puff piece."[11] Nevertheless, Myers was charged with "disruptive behavior," placed on interim suspension, ordered to vacate his dormitory, and banned from campus.[12] To justify the punishment, Oswego administrators cited a campus policy prohibiting the use of campus networks "to defame, harass, intimidate, or threaten another individual or group."[13] Only after FIRE informed Oswego that Myers' email was protected speech[14] was the charge dropped.[15]

These three examples from just over the past year involve blatant First Amendment violations. Shockingly, they represent just a few of the incidents reported to *amici* this year and a tiny percentage of those reported to FIRE since its

---

[11] William Creeley, *Journalism Student Suspended for Offending Hockey Coaches*, HUFFINGTON POST (Nov. 14, 2012, 11:06 AM), http://www.huffingtonpost.com/will-creeley/suny-oswego-journalism-alex-myer_b_2121906.html.

[12] Glenn Coin, *SUNY Oswego president "heart sick" over case of student suspended for misrepresentation*, SYRACUSE ONLINE (Nov. 16, 2012, 3:23 PM), *available at* http://www.syracuse.com/news/index.ssf/2012/11/suny_oswego_president_heartsic.html.

[13] *Id.*

[14] *See* Letter from Peter Bonilla to State University of New York at Oswego President Deborah F. Stanley, Oct. 26, 2012, *available at* http://thefire.org/article/15094.html.

[15] Glenn Coin, *How an email to three college coaches led to a near suspension for SUNY Oswego student*, SYRACUSE ONLINE (Nov. 13, 2012, 8:24 AM), *available at* http://www.syracuse.com/news/index.ssf/2012/11/how_an_email_to_three_college.html.

founding in 1999.[16] Until administrators start paying a significant price for violating student rights, behavior like that described here—and that before this Court now—will remain commonplace.

The jurisprudence protecting public college students' First Amendment rights is unambiguous. Most recently, in 2012, a federal district court struck down the University of Cincinnati's (UC's) "free speech zone," which forbade students from engaging in protected speech on all but 0.1% of the public institution's campus. *See Young Americans for Liberty v. Williams*, No. 1:12-cv-155, 2012 U.S. Dist. LEXIS 80967 at *16 (S.D. Ohio June 12, 2012). Making this free speech quarantine still more objectionable, UC required students to provide a minimum of five working days' notice prior to staging any "demonstration, picketing, or rally."[17] Citing the miniscule space allotted for "free speech" and the fact that the registration requirement essentially prohibited spontaneous speech, the court found the policy to be "anathema to the nature of a university" and enjoined the university from enforcing it. *Id.* at *26–27.

This decision is the latest in a virtually unbroken string of cases affirming the critical import of First Amendment protections for college students. *See, e.g.,*

---

[16] *See* Greg Lukianoff, Unlearning Liberty: Campus Censorship and the End of American Debate (2012).

[17] *See* S.D. Lawrence, *U Cincinnati Free Speech Restrictions Struck Down in Court*, Educ. News (June 19, 2012), *available at* http://www.educationnews.org/higher-education/u-cincinnati-free-speech-restrictions-struck-down-in-court.

*McCauley v. University of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) (invalidating university speech policies, including harassment policy); *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008) (striking down sexual harassment policy); *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995) (declaring university discriminatory harassment policy facially unconstitutional); *Young Americans for Liberty v. Williams*, No. 1:12-cv-155 (S.D. Ohio Jun. 12, 2012) (invalidating "free speech zone" policy); *Smith v. Tarrant County College District*, 694 F. Supp. 2d 610 (N.D. Tex. 2010) (finding university "cosponsorship" policy to be overbroad); *College Republicans at San Francisco State University v. Reed*, 523 F. Supp. 2d 1005 (N.D. Cal. 2007) (enjoining enforcement of university civility policy); *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004) (finding university sexual harassment policy unconstitutionally overbroad); *Bair v. Shippensburg University*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) (enjoining enforcement of university harassment policy due to overbreadth); *Booher v. Board of Regents, Northern Kentucky University*, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998) (finding university sexual harassment policy void for vagueness and overbreadth); *The UWM Post, Inc. v. Board of Regents of the University of Wisconsin System*, 774 F. Supp. 1163 (E.D. Wis. 1991) (declaring university racial and discriminatory harassment policy facially unconstitutional); *Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989) (enjoining enforcement of

university discriminatory harassment policy). That violations like these still occur regularly demonstrates the need for courts not only to allow students to vindicate their expressive rights, but also to impose a cost on those who abridge them.

The routine infringement of student First Amendment rights is having a profound and devastating impact on campus inquiry. In a 2010 survey, the Association of American Colleges and Universities found that just 30% of students agree that it is safe to hold unpopular views on campus.[18] Yet the Supreme Court has made clear that if students are not free to explore and express ideas, then "our civilization will stagnate and die." *Sweezy*, 354 U.S. at 250; 77 S. Ct. at 1212. In the instant case, Zaccari—like too many of his peers nationwide—decided to ignore long-established law. This Court must remind Zaccari that respecting the First Amendment is not optional.

### B. Barnes Suffered Retaliation for Expressive Activity Protected by the First Amendment.

As alleged in Barnes' complaint, and as confirmed in the proceedings below, Zaccari—annoyed and embarrassed by Barnes' persistent opposition to his plan to build parking garages on campus—expelled Barnes for engaging in core protected

---

[18] ERIC L. DEY, MOLLY C. OTT, MARY ANTONAROS, CASSIE L. BARNHARDT & MATTHEW A. HOLSAPPLE, ENGAGING DIVERSE VIEWPOINTS: WHAT IS THE CAMPUS CLIMATE FOR PERSPECTIVE-TAKING? (Washington, D.C.: Association of American Colleges and Universities, 2010), *available at* http://www.aacu.org/core_commitments/documents/Engaging_Diverse_Viewpoints.pdf.

speech. In this Circuit, a plaintiff has suffered First Amendment retaliation "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."[19] *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). Here, Zaccari, the university president, summoned Barnes, an undergraduate, to his office. *Barnes*, 757 F. Supp. 2d at 1317; Compl. at ¶ 30. Zaccari insisted that Barnes come alone to the meeting, which lasted over an hour. *Id.*; Compl. at ¶ 31. Zaccari told Barnes he "could not forgive" Barnes for embarrassing him. *Id.*; Compl. at ¶ 33. For questioning his judgment, Zaccari asked Barnes, "Who do you think you are?" *Id.*

*Amici* interact with thousands of students every year. Few of them would be willing to further speak their minds after interrogation by their university president. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (stating that assessing allegations of First Amendment retaliation "is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts"). When Barnes continued to advocate against the parking garages, Zaccari increased his efforts to silence him. *Abella v. Simon*, 522 F. App'x 872, 874 (11th Cir. 2013)

---

[19] The elements for establishing a retaliation claim require that a plaintiff establish "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

(stating that even if an individual plaintiff is not deterred, a First Amendment retaliation claim is not precluded if a person of ordinary firmness would be silenced). Zaccari escalated his efforts by claiming a Facebook collage that Barnes had created to oppose the garages was a threat. Although Zaccari could not present a shred of evidence to that effect, and after at least five occasions on which senior officials stated that Barnes was not a threat, Zaccari expelled Barnes, claiming he presented a "clear and present danger." *Barnes*, 757 F. Supp. 2d at 1322–23.

Barnes' ordeal is a shocking example of administrative willingness to trample student speech—and a textbook example of First Amendment retaliation. As state officials, public university presidents like Zaccari "may not retaliate against private citizens because of the exercise of their First Amendment rights." *Bennett*, 423 F.3d at 1255 (11th Cir. 2005); *see also Georgia Association of Educators v. Gwinnett County Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988). A public university cannot lawfully expel a student in retaliation for expressive activity protected by the First Amendment. *See Papish v. Board of Curators of the Univ. of Mo.*, 410 U.S. 667, 669–71, 93 S. Ct. 1197 (1973).

Barnes expressed opposition to the garages' construction through the type of speech the First Amendment is specifically intended to protect. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S. Ct. 710, 720 (1964). In return, Zaccari berated Barnes, attempted to convince others that Barnes was dangerous, and

finally expelled him. Rarely is there clearer evidence of retaliation for protected speech than that presented here.

### C. Failing to Correct the Erroneous District Court Grant of Summary Judgment on Barnes' First Amendment Claim Will Encourage Further Abuse of Student First Amendment Rights.

The district court erred in granting Zaccari summary judgment regarding Barnes' First Amendment retaliation claim. *Barnes*, 757 F. Supp. 2d at 1333. The court erroneously construed Barnes' First Amendment claim as a conspiracy claim, and then concluded that the claim failed as a matter of law because the adverse actions were taken by Zaccari alone. *Id.* at 1333.

To properly analyze the sufficiency of a plaintiff's claim, the Federal Rules of Civil Procedure require that allegations in a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555; 127 S. Ct. 1955, 1964–65 (2007). The allegation must be sufficient "to state a claim to relief that is plausible on its face." *Id*. at 570; at 1974. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678; 129 S. Ct. 1937, 1949–50 (2009) (holding that mere conclusory statements and recitation of the elements of a cause of action are insufficient). *See also Randall v. Scott*, 610 F.3d 701, 708–10 (11th Cir. 2010) (applying *Iqbal* and *Twombly* pleading requirements in assessing whether a retaliation claim had been

15

properly pleaded). While conclusory statements do not suffice, detailed allegations of retaliatory actions—like those in Barnes' complaint—exceed this standard.

No fair reading of Barnes' complaint can transform his First Amendment retaliation claim into a conspiracy claim.[20] Barnes' complaint uses the word "conspiracy" twice while putting forth a detailed account of how his expulsion was the direct result of Zaccari's response to his protected expression. Compl. at ¶¶ 23–27, 33, 36–39, 45, 50–52, 60, 64, 71–76, 84–89. Indeed, the district court's implicit conclusion that Zaccari's actions so violated Barnes' rights that none of the other named defendants would agree with him demonstrates the injustice in reading the complaint in a manner that allows Zaccari to avoid liability for his retaliatory actions. *See Barnes*, 757 F. Supp. 2d at 1326, 1330, 1332.

Upholding the district court's cramped interpretation of Barnes' First Amendment claim will excuse Zaccari's blatantly unconstitutional retaliation and signal that student First Amendment rights are of little value. Because any fair reading of Barnes' complaint supports the conclusion that he has properly brought

---

[20] Even if Barnes's First Amendment claim *were* properly construed as a conspiracy claim, it still must survive summary judgment. The district court found ample evidence that Zaccari retaliated against Barnes for engaging in protected activity. It also found that Elizabeth Neely, Vice Chancellor for Legal Affairs for the Board of Regents, advised Zaccari he "should focus on the safety of campus and himself and 'we'll worry about the lawsuit later.'" *Barnes*, 757 F. Supp. 2d at 1321. When viewed in a light most favorable to the non-moving party, this alone is enough for a conspiracy claim to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243; 106 S. Ct. 2505, 2510 (1986).

a First Amendment retaliation claim against Zaccari, and because the record and the district court's findings demonstrate that Barnes was the victim of Zaccari's retaliation, this Court must reverse the grant of summary judgment on this claim and remand for further proceedings.

## II. By Sharply Reducing Barnes' Attorney's Fees Award, the District Court Ignored the Public Benefit Produced by Barnes' Victory and Dangerously Discounted the Cost of Violating Student Rights.

Congress passed the Civil Rights Attorney's Fees Award Act of 1976 to permit the award of reasonable fees to the prevailing party in actions brought under civil rights statutes.[21] The statute was intended to strengthen access to judicial remedies for victims of civil rights violations—victims like Hayden Barnes—by allowing their counsel to be fairly compensated for securing a just result.[22] Given the vast disparity between the resources typically available to would-be student

---

[21] The Act amended 42 U.S.C. § 1988.

[22] The Supreme Court has recognized that "a major purpose of the Civil Rights Attorney's Fees Awards Act was to benefit those claiming deprivations of constitutional and civil rights," citing the legislative history of the Act. *Maine v. Thiboutot*, 448 U.S. 1, 9–10 n.10; 100 S. Ct. 2502, 2507 (1980) (quoting S. REP. NO. 94-1011, p. 4 (1976)). *See also Hensley v. Eckerhart*, 461 U.S. 424, 429; 103 S. Ct. 1933, 1937 (1983) ("The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances.") (quoting H. R. REP. NO. 94-1558, p. 1 (1976)); Armand Derfner, *Background and Origin of the Civil Rights Attorney's Fee Awards Act of 1976*, 37 URB. LAW. 653 (2005) (discussing importance of attorney's fees awards to "(1) provide funds to civil rights lawyers and organizations who were already bringing cases but had scarce resources, (2) attract other lawyers to these cases, and (3) show violators that resistance could be costly, thus creating an incentive for obeying the law.").

plaintiffs in comparison to public colleges and their administrators, the potential for attorney's fees is crucially important to students seeking representation following a rights violation. Indeed, the protection of civil liberties on our nation's public campuses depends in large part on the Civil Rights Attorney's Fees Award Act.

Barnes' constitutional rights—and thus the rights of students nationwide—have been vindicated as a result of his success in this litigation. Both this Court's previous ruling and the jury's award of compensatory damages affirm that public college students possess well-established due process rights and make clear that violating those rights has a cost. Despite this important victory for students across the country, the district court imposed a severe adjustment to the fees awarded to Barnes' counsel, sharply reducing the total award. To ensure the vigilant protection of student civil liberties and satisfy the purpose of the Civil Rights Attorney's Fees Award Act, this adjustment must be reversed.

### A. In Assessing the Success of Civil Rights Litigation, Courts Must Weigh the Public Benefit Secured by the Result.

The Supreme Court has endorsed a set of relevant factors to guide courts in determining whether adjustments are warranted to the amount of a reasonable attorney's fee award for a prevailing party under § 1988.[23] Of these considerations,

---

[23] "These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the

the Court has placed particular emphasis on "the important factor of the 'results obtained,'" instructing courts to "focus on the significance of the overall relief obtained by the plaintiff." *Hensley*, 461 U.S. at 434, 435; 103 S. Ct. at 1940. In assessing the award, courts must recognize that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id*. at 434; 103 S. Ct. at 1940.

Determining whether a plaintiff's result is "excellent" requires consideration of "what constitutes 'success' in a complex civil rights case" like the one at issue. *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1305 (11th Cir. 2001). In answering this question, this Court has held that "public benefit is a distinct measure of success in civil rights actions." *Id*. at 1307. Indeed, securing a public benefit via civil rights litigation fulfills Congress' intent in passing the Civil Rights Attorney's Fees Award Act. *Riverside*, 477 U.S. at 575; 106 S. Ct. at 2694 ("Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit 'does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest importance.'")

---

preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Riverside v. Rivera*, 477 U.S. 561, 568 n.3; 106 S. Ct. 2686, 2691 n.3 (1986) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)).

19

(quoting H. R. REP. NO. 94-1558, p. 2 (1976) (in turn quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402; 88 S. Ct. 964, 966 (1968))). Therefore, "[t]o avoid undermining the purpose of § 1988, a court must account for that distinct measure of success when calculating an award of fees and costs." *Id.*

### B. The District Court Erred by Failing to Recognize the Important Public Benefit Obtained by Barnes' Victory.

The district court erred by failing to accord appropriate weight to the fact that Barnes has "benefitted the public interest by vindicating his constitutional rights," thus disregarding this Court's instruction that "[t]he affirmation of constitutional principles produces an undoubted public benefit that courts must consider in awarding attorneys' fees under Section 1988." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th Cir. 1987).

Barnes' victory serves the legislative purpose of the Civil Rights Attorney's Fees Award Act—and the public—in important ways ignored by the district court. First, while Barnes still seeks the vindication of his constitutional right to freedom of expression, he has already successfully vindicated his constitutional right to due process. This is an excellent result. Reaffirming the primacy of this core right following a shocking violation like that suffered by Barnes "cannot be valued solely in monetary terms." *Riverside*, 477 U.S. at 574; 106 S. Ct. at 2694. In the educational setting, where "[t]he risk of error is not at all trivial" and unjustified suspension or expulsion will dramatically harm a student's academic opportunities,

20

professional prospects, and personal well-being, respect for due process rights is of crucial importance. *Goss v. Lopez*, 419 U.S. 565, 580; 95 S. Ct. 729, 736 (1975). A student who, like Hayden Barnes, has been unlawfully denied due process protections risks an "unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences"—a result that "disserves both his interest and the interest of the State." *Id.* at 581; 95 S. Ct. at 736. As this Court has observed, expulsion without due process, "if not corrected by the courts, can well break the spirits of the expelled students and of others familiar with the injustice, and do inestimable harm to their education." *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 157 (5th Cir. 1961). *See also Nash v. Auburn University*, 812 F.2d 655, 667 (11th Cir. 1987) (due process "provides a guarantee against arbitrary decisions that would impair [college students'] constitutionally protectable interests."). Given the Supreme Court's recognition of "the importance to organized society" that the right to procedural due process "be scrupulously observed," Barnes' victory serves as a necessary corrective. *Carey v. Piphus*, 435 U.S. 247, 266; 98 S. Ct. 1042, 1054 (1978).

Secondly, Barnes and his counsel have achieved a highly publicized and widely noted victory that continues to resonate throughout higher education. By securing justice following an egregious constitutional violation, Barnes' litigation has served an important educational function, as evidenced by the widespread

public attention it has received in local outlets,[24] student newspapers,[25] national newspapers,[26] international publications,[27] higher education journals,[28] law reviews,[29] and popular websites.[30]

---

[24] *See*, *e.g.*, Maureen Downey, *Court rules for ousted student and against former president in Valdosta State University case*, ATLANTA J.-CONST. (Sept. 8, 2010, 3:31 PM), http://blogs.ajc.com/get-schooled-blog/2010/09/08/court-rules-for-ousted-student-and-against-former-president-in-valdosta-state-university-case; Brandon Larrabee, *Valdosta State student sues after he's expelled*, ATHENS BANNER-HERALD, Jan. 12, 2008, *available at* http://onlineathens.com/stories/011208/news_20080112030.shtml; Quinten Plummer, *Federal jury returns Zaccari verdict*, VALDOSTA DAILY TIMES, Feb. 2, 2013, *available at* http://www.valdostadailytimes.com/local/x503840173/Federal-jury-returns-Zaccari-verdict.

[25] *See*, *e.g.*, Chris Chiego, *Expulsion for protest unfair*, RED & BLACK (University of Georgia), Jan. 17, 2008, *available at* http://thefire.org/public/pdfs/24347bdce90edcf537fb2898f1f7ee72.pdf?direct; Will Lewis, *Jury reaches verdict on Zaccari trial*, VALDOSTA ST. U. SPECTATOR, Feb. 7, 2013, *available at* http://vsuspectator.com/2013/02/07/jury-reaches-verdict-on-zaccari-trial.

[26] *See*, *e.g.*, Elizabeth Bernstein, *Schools Struggle With Dark Writings*, WALL ST. J., May 20, 2008, *available at* http://online.wsj.com/news/articles/SB121124048245705393?mod=tff_main_tff_top; Greg Lukianoff, *Campus Clampdowns on Free Speech Flunk Their Legal Tests*, WALL ST. J., Feb. 16, 2013, *available at* http://online.wsj.com/news/articles/SB10001424127887324162304578302901939912238; Mary Beth Marklein, *Students' rights weighed as colleges try to assess threats*, USA TODAY, Jan. 14, 2011, *available at* http://usatoday30.usatoday.com/news/education/2011-01-13-colleges-keep-watch-for-violent-students_N.htm.

[27] *See*, *e.g.*, Nico Perrino, *Universities: where you go to learn—and be monitored*, GUARDIAN (Oct. 22, 2013), http://www.theguardian.com/commentisfree/2013/oct/22/online-social-media-surveillance-university-campuses.

[28] *See*, *e.g.*, Andy Guess, *Maybe He Shouldn't Have Spoken His Mind*, INSIDE HIGHER ED (Jan. 11, 2008), http://www.insidehighered.com/news/2008/01/11/Valdosta; Sara Lipka, *Federal*

The public benefit provided by the extensive attention to Barnes' case and his eventual victory is immense and multifaceted. The litigation has educated the public at large about the threats to student civil liberties and the importance of defending against them. Through the case's coverage, students have learned about

*Judge Finds Former College President Personally Liable in Student-Conduct Case*, CHRON. OF HIGHER EDUC., Sep. 7, 2010, *available at* http://chronicle.com/article/Former-College-President-Is/124331; *President Personally Liable for Student's Expulsion, Jury Says*, INSIDE HIGHER ED (Feb. 5, 2013), http://www.insidehighered.com/quicktakes/2013/02/05/president-personally-liable-students-expulsion-jury-says.

[29] *See, e.g.*, Andrew Kloster, *Speech Codes Slipping Past the Schoolhouse Gate: Current Issues in Students' Rights*, 81 UMKC L. REV. 617 (2013); Azhar Majeed, *Putting Their Money Where Their Mouth Is: The Case for Denying Qualified Immunity to University Administrators for Denying Students' Speech Rights*, 8 CARDOZO PUB. L. POL'Y & ETHICS J. 515 (2010); Darryn Cathryn Beckstrom, Comment, *Who's Looking at Your Facebook Profile? The Use of Student Conduct Codes to Censor College Students' Online Speech*, 45 WILLAMETTE L. REV. 261 (2008); Eric A. Hoffman, Note & Comment, *Taking a Bullet: Are Colleges Exposing Themselves to Tort Liability By Attempting to Save Their Students?*, 29 GA. ST. U.L. REV. 539.

[30] *See, e.g.*, Angus Johnston, *Expelled Student Activist Wins $50K Court Judgment Against University President*, STUDENT ACTIVISM (Feb. 4, 2013), http://studentactivism.net/2013/02/04/expelled-student-activist-wins-50k-court-judgment-against-university-president; George Leef, *Crushing Defeat for Valdosta Administrator*, NAT'L REV. ONLINE (Feb. 7, 2013, 12:53 PM), http://www.nationalreview.com/phi-beta-cons/339977/crushing-defeat-valdosta-administrator-george-leef; Greg Lukianoff, *Breaking: Federal Jury Finds College President Personally Liable in 'Facebook Collage' Case*, HUFFINGTON POST (Feb. 1, 2013, 4:20 PM), http://www.huffingtonpost.com/greg-lukianoff/breaking-federal-jury-fin_b_2601036.html; Rachel Moran, Unlearning Liberty*: Censorship on College Campuses*, REASON (Oct. 26, 2012, 3:00 PM), http://reason.com/blog/2012/10/26/unlearning-liberty-censorship-on-college; Bruce Thornton, *College: Where Free Speech Goes to Die*, REALCLEARPOLITICS (Mar. 4, 2013), http://www.realclearpolitics.com/articles/2013/03/04/college_where_free_speech_goes_to_die_117271.html.

the extent of their rights and the means to vindicate them. As a result of the efforts of interested organizations like *amici* here, attorneys and advocates nationwide have been called to the defense of civil liberties on campus.

Most immediately, however, Barnes' success has served as a vivid cautionary tale to public university administrators nationwide, warning of the severe consequences for violating the clearly established constitutional rights of their students. For example, *Campus Legal Advisor* ("Interpreting the Law for Higher Education Administrators") deemed the denial of qualified immunity to Zaccari a "wake-up call" for its readers, noting that observers called the district court's 2010 opinion "a landmark case in the world of higher education."[31] In a February 2013 presentation to the Association for Student Conduct Administration's annual conference, noted student affairs administration expert and risk management consultant Dr. John Wesley Lowery identified Barnes' victory as one of "the most significant pieces of legislation passed and court decisions handed down impacting student conduct administration and practice over the past 25 years."[32] In a declaration filed with the district court, Robert O'Neil—

---

[31] Allan L. Shackelford, *'Personal liability' should be wake-up call for presidents, senior administrators*, CAMPUS LEGAL ADVISOR, Dec. 2010 at 3.

[32] John Wesley Lowery, *25 Years of Legislation and Litigation Impacting Student Conduct Administration*, https://sites.google.com/site/drjohnwesleylowery/home/2013-asca-conference/25yearsoflegislationandlitigationimpactingstudentconductadministration. Lowery is the chair of the Student Affairs in Higher Education Department at

former president of both the University of Virginia and the University of Wisconsin System, and current Senior Fellow of the Association of Governing Boards of Universities and Colleges—stated that Barnes' victory would have "an important deterrent effect on any similar disregard of basic due process rights by others within the higher education community."[33] O'Neil observed that "there is no doubt" that Zaccari's liability would prove to be a "warning that fellow administrators are very likely to heed, and the ominous potential effects of which are likely to be widely noted."[34] The cumulative deterrent impact of Barnes' victory provides a robust public benefit. As this Court has stated: "When courts affirm the constitutional rights of citizens, public officials are deterred from violating other citizens' rights in the future." *Popham*, 820 F.2d at 1580.

Despite being instructed by the decisions of both this Court and the Supreme Court to grant significant weight to the public benefit secured by Barnes' victory, the district court all but ignored it. After five sentences of *pro forma* consideration acknowledging the declarations of O'Neil and FIRE President Greg Lukianoff in

---

Indiana University of Pennsylvania and an affiliated consultant with the National Center for Higher Education Risk Management. *See* John Wesley Lowery, *Biography*, https://sites.google.com/site/drjohnwesleylowery.

[33] ECF No. 367-4, Declaration of Robert M. O'Neil, at 4.

[34] *Id.* at 5.

passing,[35] the district court dramatically reduced Barnes' attorney's fee award by sixty percent.[36]

While agreeing that "there was never any question but that Defendant [Zaccari] expelled Plaintiff Barnes from Valdosta State University and denied Barnes due process," the district court failed to recognize the importance of remedying this denial.[37] Instead, the district court dismissed the case as "largely hot air" because it "made no new law" and because the "rights of one in Plaintiff's position were the same before and after the verdict."[38] This unjustifiably cramped view of Barnes' victory cannot be squared with the assessment of its import provided by higher education attorneys and administrators alike.

The district court also cited as justification Barnes' failure to prevail on all claims[39] and the disparity between the damages and fees sought by Barnes and the amount recovered.[40] But the Supreme Court has made clear that "the fee award should not be reduced simply because the plaintiff failed to prevail on every

---

[35] *Barnes v. Zaccari*, No. 7:12-cv-89 (HL) (M.D. Ga. July 24, 2013) at 57–58 [hereinafter "Order"].

[36] The sixty percent reduction was enforced in addition to both voluntary fee reductions by Barnes' counsel, per exercises of billing judgment, and reductions to the hourly rates of Barnes' counsel imposed by the district court. Order at 52–55.

[37] Order at 68, n.16. Notwithstanding the district court's assessment of the self-evident merit of Barnes' due process claim, Barnes would not have prevailed without skilled representation.

[38] *Id.*

[39] *Id.* at 58.

[40] *Id.*

contention raised in the lawsuit," *Hensley*, 461 U.S. at 435; 103 S. Ct. at 1940, and this Court has identified the deterrence achieved by successful civil rights litigation to be of such salutary effect that the public benefit "could well be as important as the monetary damages recovered." *Davis v. Locke*, 936 F.2d 1208, 1215 (11th Cir. 1991). Indeed, the Supreme Court has held that in passing the Civil Rights Attorney's Fees Award Act, "Congress recognized that reasonable attorney's fees under § 1988 are not conditioned upon and need not be proportionate to an award of money damages." *Riverside*, 477 U.S. at 576; 106 S. Ct. at 2695.

Because of the public benefit obtained by prevailing on his claim, Barnes and his counsel have secured an excellent result. By failing to recognize that "the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff," the district court erred. *Hensley*, 461 U.S. at 444, n.4; 103 S. Ct. at 1946, n.4 (Brennan, J., concurring in part and dissenting in part). This Court has held that failure to properly account for the public benefit accrued by successful civil rights litigation is error worthy of remand and reconsideration. In *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1308 (11th Cir. 2001), this Court rejected a district court's reduction of a prevailing civil rights plaintiff's fee award based on a finding of limited success because of the district court's failure to

27

sufficiently consider the public benefit obtained. On remand, this Court instructed the district court to "examine the qualitative value of" plaintiff's success, including specific directions to account for "the vital role private litigation plays in the enforcement of civil rights, the difficulties involved in sustaining those lawsuits," and "the public benefit that occurs when those lawsuits ultimately vindicate a constitutional right." *Villano*, 254 F.3d at 1308. Because of the district court's equivalent failure in the instant case, similar action by this Court is necessary here.

### C. Allowing the District Court's Discount of Barnes' Award to Stand Would Signal That Student Rights May Be Violated Without Cost.

This litigation has been and continues to be closely watched by students, faculty, administrators, attorneys, and concerned citizens nationwide. Barnes' victory provided observers with sorely needed confirmation of the importance of protecting student rights. The important and necessary reminder achieved by Barnes' victory would be diminished, however, by upholding the district court's sharp, unjustified reduction in the attorney's fees award.

The district court's reduction failed to recognize and account for the public benefit gained by vindicating constitutional rights, educating students, administrators, and citizens about civil liberties, and deterring future rights violations. Affirming that ruling would send two damaging signals.

First, the reduced award would signal to attorneys that representing student victims of civil liberties violations is not a valuable use of their expertise and time. If skilled attorneys abandon the cause of student liberties because of judicial reluctance to recognize the benefit secured by vindicating student rights, then future victims of shocking rights violations like the one at issue here will be without the judicial access that Congress intended to preserve in passing the Civil Rights Attorney's Fees Award Act. The next student facing the unconstitutional treatment suffered by Hayden Barnes will be unable to obtain justice on his or her own.

Second, the reduced award would communicate to public university administrators and counsel that violating student rights may be of little cost. When faced with a choice between respecting a student critic's rights to freedom of expression and due process or silencing and expelling her, a public college administrator may recall the result here and conclude not only that the student is unlikely to secure counsel, but also that any ultimate financial cost will be minimized by the court. Given the Supreme Court's repeated recognition of the importance of student civil liberties, this is precisely the wrong result for the health of our democracy. *Sweezy*, 354 U.S. at 250; 77 S. Ct. at 1211.

The ability to seek recourse in federal court for rights violations like those suffered by Barnes is crucial for public university students. Because today's

29

students are tomorrow's leaders, it is equally important to our nation as a whole. For these reasons, the district court's meager interpretation of the public benefit of Barnes' victory—and the consequent fee reduction—must be reversed and remanded.

## CONCLUSION

This case presents an opportunity to reaffirm the First Amendment rights of public college students. Because Barnes was expelled for exercising his right to free expression, this Court must recognize the district court's error in finding that Barnes failed to state a First Amendment retaliation claim. Moreover, upholding the district court's decision to sharply reduce Barnes' attorney's fees award would indicate that protecting students' constitutional rights is of little public importance. This Court must overturn the district court's decision on attorney's fees by properly assessing the public benefit of successful civil rights litigation vindicating student civil liberties.

Respectfully Submitted,

/s/ Lawrence G. Walters
Lawrence G. Walters
Walters Law Group
195 W. Pine Ave.
Longwood, FL 32750
(407) 975-9150
*Counsel for Amici Curiae*

Date: December 16, 2013

30

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the Bar of the United States Court of Appeals for the Eleventh Circuit.

<u>/s/ Lawrence G. Walters</u>
Lawrence G. Walters
Walters Law Group
195 W. Pine Ave.
Longwood, FL 32750
(407) 975-9150

*Counsel for Amici Curiae*

Date: December 16, 2013

## CERTIFICATE OF COMPLIANCE

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14-point Times New Roman font.

3) This brief and cover pages were prepared in compliance with 11th Cir. R. 32–4.

/s/ Lawrence G. Walters
Lawrence G. Walters
Walters Law Group
195 W. Pine Ave.
Longwood, FL 32750
(407) 975-9150

*Counsel for Amici Curiae*

Date: December 16, 2013

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 16, 2013, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will automatically send an email notification of such filing to the attorneys of records who are registered CM/ECF users.   Additionally, an seven (7) identical copies of the electronic filing will be mailed to the clerk via USPS priority mail and one copy will be mailed to all attorneys on the attached Service List via USPS priority mail.

/s/ Lawrence G. Walters
Lawrence G. Walters
Walters Law Group
195 W. Pine Ave.
Longwood, FL 32750
(407) 975-9150

*Counsel for Amici Curiae*

Date: December 16, 2013

# BRIEF SERVICE LIST

*Attorneys for Plaintiff-Appellant*

Robert Corn-Revere
Christopher A. Fedeli
Ronald G. London
Lisa Beth Zycherman
Davis Wright Tremaine, LLP
1919 Pennsylvania Avenue, NW,
Suite 800
Washington, DC 20006-3401

Cary Stephen Wiggins
Wiggins Law Group
260 Peachtree Street, NW,
Suite 401
Atlanta, GA 30303-1253

*Attorneys for Defendant-Appellees*

David C. Will
Holly Hance
Royal, Washburn, Will
4799 Sugarloaf Parkway, Suite J
Lawrenceville, GA 30044-8836

Samuel S. Olens
Attorney General's Office
40 Capitol Square, SW
Atlanta, GA 30334-9057

Paul Robert Koster
Matthew Richard LaVallee
Daley, Koster & LaVallee, LLC
2849 Paces Ferry Road, SE, Suite 160
Atlanta, GA 30339-3769

David R. Smith
Brannen, Searcy & Smith
22 E 34th Street
Savannah, GA 31401-7433

*Attorneys for Amicus Curiae, Alliance Defending Freedom*

Travis Christopher Barham
Alliance Defending Freedom
Alliance Defense Fund
1000 Hurricane Shoals Rd., N.E., Ste. D-1100
Lawrenceville, GA  30043

/s/ Lawrence G. Walters
Lawrence G. Walters
*Counsel of Record for Amici Curiae,
FIRE et al.*
Dated: December 16, 2013