[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13800

_____

D.C. Docket No. 7:12-cv-00089-HL

THOMAS HAYDEN BARNES,

Plaintiff - Appellant,

versus

RONALD M. ZACCARI,
individually and in his official capacity as
President of Valdosta State University,
VALDOSTA STATE UNIVERSITY,
BOARD OF REGENTS OF THE UNIVERSITY
SYSTEM OF GEORGIA,
LAVERNE GASKINS,
individually and in her official capacity as
in-house counsel at Valdosta State University,
KURT KEPPLER,
individually and in his official capacity as Vice President
for Student Affairs at Valdosta State University, et al.,

Defendants- Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(January 12, 2015)

Before JORDAN and BENAVIDES,[*] Circuit Judges, and BARTLE,[**] District Judge.

PER CURIAM:

## I.    BACKGROUND

This action was brought by Plaintiff-Appellant Thomas Hayden Barnes ("Barnes") against Valdosta State University ("VSU") and various VSU officials and employees, alleging constitutional and statutory violations and breach of contract.  During the relevant time period in 2007, Barnes was a student at VSU.

Barnes had previously been enrolled at VSU in the fall of 2005 as a transfer student, but he subsequently left while on academic probation to attend paramedic school in Savannah, Georgia in 2006.  In January 2007, Barnes re-enrolled at VSU and contacted the VSU Access Office, which provides services to students with disabilities, to register as an on-campus disabled student suffering from a panic disorder with agoraphobia.  Dr. Kimberly Tanner, Director of the VSU Access Office, assisted Barnes in submitting the proper documentation of his disability and to assist him in securing housing accommodations that VSU had available for Barnes.  After re-enrolling at VSU, Barnes resumed therapy sessions with Leah McMillan ("McMillan"), a licensed therapist at VSU's counseling center.

---

[*]   The Honorable Fortunato P. Benavides, United States Circuit Judge for the Fifth Circuit, sitting by designation.

[**] The Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

VSU had experienced a growth in student population, and VSU had a long-term development plan to accommodate that growth. Part of that plan included the construction of a parking garage. In March of 2007, Barnes became concerned about the potential environmental impact of the parking garage and put up flyers protesting the construction. After Defendant-Appellee Dr. Ronald Zaccari ("Zaccari"), the President of VSU, became aware of the flyers, he asked his assistant to find out who was responsible for them. She informed him that Barnes had made the flyers.

On March 26, Zaccari had an unrelated meeting with an environmental campus organization named "S.A.V.E." During that meeting, he inquired whether the members knew Barnes. They told him that Barnes had been part of their organization but had decided to "go off on his own." After the meeting, one of the members apparently informed Barnes that Zaccari had made a comment about the flyers. Barnes then wrote a letter of apology and took down the flyers. Zaccari believed that this meant Barnes was no longer protesting the construction of the parking garage.

However, Barnes had been contacting the individual members of the VSU Board of Regents by telephone and email in anticipation of the Board's upcoming meeting on April 17, 2007, to voice his opposition to the parking garage. Zaccari learned of these communications when Linda Daniels ("Daniels"), a Vice

3

Chancellor, contacted Zaccari and informed him that she was concerned that Barnes might disrupt the Board meeting. Daniels asked campus police at Georgia Southern University, where the meeting was to be held, to provide additional security as a precaution.

On April 16, Zaccari learned of the fatal shootings that had taken place on Virginia Tech's campus. These fatal shootings caused Zaccari to have a heightened concern regarding campus safety at VSU. That same day, Barnes called Zaccari to request a meeting, and Zaccari met with Barnes at 5pm. Russ Mast ("Mast"), Dean of Students, was also present at this meeting. They discussed Barnes's opposition to the parking garage. Zaccari explained how VSU had approved the construction and funding of the parking garage. Zaccari felt that Barnes was unresponsive despite what he believed were attempts to have a productive discussion. Zaccari admitted that he was "stern" with Barnes. Zaccari told Barnes that he was "personally offended" by Barnes's activities and "didn't know what to do with [Barnes]." Zaccari "was upset that Hayden had [gone] to the members of the Board of Regents and [said] that he was embarrassed that [Barnes] did not come and talk to him about that." Ultimately, Barnes assured them that he did not plan to attend or protest at the board meeting.

After meeting with Barnes, Zaccari learned that Barnes had been writing about the parking garage on his Facebook page. Zaccari was subsequently given a

4

copy of what Barnes had posted on Facebook, a collage titled "S.A.V.E. – Zaccari Memorial Parking Garage," which included a picture of Zaccari. Zaccari told his staff that he felt threatened by the posting.

On April 19, VSU's newspaper published Barnes's letter to the editor criticizing the construction of the parking garage. On April 20, Zaccari met with Mast, Campus Police Major Ann Farmer ("Major Farmer"), Dr. Kurt Keppler ("Keppler"), Vice President of Student Affairs, and Tanner, to discuss Zaccari's concerns and to begin an investigation of Barnes. Zaccari informed the group that Barnes had distributed flyers on the campus protesting the parking garage and made phone calls to individual members of the Board of Regents. He showed the group the collage that Barnes had posted on his Facebook page. He also told the group that an intruder had tripped the alarm at his residence and that he had been receiving calls from a male individual asking for the "business office" and then hanging up the phone. No evidence ever connected Barnes to the alarm or the phone calls.

Tanner told the group that Barnes was registered with the Access Office and revealed some of his medical background, including that Barnes had a thought depressive disorder, agoraphobia, and panic disorder. She also said that Barnes was now on medication but had previously been hospitalized due to an inability to

function.  Additionally, Tanner stated that Barnes had been admitted to VSU on academic probation.

Major Farmer took contemporaneous meeting notes that indicated that Mast suggested that the Facebook collage could be viewed as a veiled threat and used as a basis for a disorderly conduct withdrawal.  It is not apparent to us that this collage on its face directly or indirectly expresses a threat or suggests that harm would come to Zaccari or anyone else.  The notes also provided that Zaccari pointed out that board member Daniels had been so concerned about Barnes's phone calls that she had alerted the campus police department at Georgia Southern University prior to the board meeting.

At one point during the meeting, Major Farmer advised Zaccari to apply for a restraining order against Barnes if he felt threatened.  However, Zaccari never applied for a restraining order.  After this meeting, Farmer investigated Barnes and determined that there was no credible threat.

On April 23, Barnes sent Zaccari a letter requesting that he be exempted from the $100 mandatory student fee that he believed was earmarked for the parking garage.  Barnes also wrote that he would contribute $100 to an "environmental-related program on campus to compensate for the loss to the University's revenue."

On April 24, Zaccari asked McMillan, Barnes's therapist, to obtain background information on Barnes and to provide her assessment of Barnes, and the two met to discuss Barnes. McMillan told Zaccari that Barnes was having difficulty with his classes and that his grades might not make the probationary level to allow him to remain at VSU. In addition, Barnes had lost his employment and his medication was not working properly. She also told Zaccari that Barnes had not seen his psychiatrist for some period of time.

During this same week, Zaccari called another meeting with Farmer, Mast, and Keppler. Zaccari told the group that Barnes had sent a letter requesting to be exempt from the $100 fee. Additionally, Zaccari reported that Barnes placed a link on his Facebook page to an article that discussed the mentally ill shooter from Virginia Tech. Zaccari informed the group that he had spoken to Barnes's previous employer at the South Georgia Medical Center, where he had worked as an emergency medical technician. He had been put on probation and then terminated. Per Zaccari's request at the meeting, Farmer arranged for two plain-clothes security officers to guard Zaccari at certain functions.

On May 1, Zaccari had a discussion with Laverne Gaskins ("Gaskins"), in-house counsel for VSU, and Betsy Neely, Vice Chancellor for Legal Affairs for the Board of Regents, regarding VSU's medical withdrawal policy. Under this policy, if there was an emergency situation, the student would not receive a hearing.

Zaccari asked about administratively withdrawing Barnes, and Neely told him to do what he had to do to keep the campus safe and that they would worry about a lawsuit at a later date.[1]

On May 3, Zaccari met with Gaskins; Farmer; Keppler; Mast; Tanner; and Victor Morgan ("Morgan"), Director of VSU's Counseling Center. Zaccari said that if they were to proceed with a disorderly conduct withdrawal, they would have to convene a student-faculty review. Gaskins expressed concerns that Barnes was entitled to have a hearing. Zaccari then stated that if they implemented an administrative withdrawal, they needed to show a threat to Barnes himself or the community. Zaccari mentioned that they "must be concerned with First Amendment rights, but first we have to look at the safety issue. Ultimately, we have to have documentation to support that [Barnes] is a danger and a threat." He then asked the group, "How do we present to a third party that a threat exists?" Zaccari then stated that Barnes's putting up flyers, writing an apology letter, calling board members, and his writings on Facebook were "out of the norm."

Zaccari told the group that Neely had previously asked him why he did not withdraw Barnes immediately. However, Zaccari stated that he wanted to allow Barnes to finish final exams that week, and Zaccari "didn't want to cause an uproar that could cause a flashpoint."

---

[1]    After an administrative withdrawal, a student may be eligible to be readmitted to VSU. After an expulsion, generally speaking, a student is not eligible to be readmitted.

Zaccari indicated that if Barnes was administratively withdrawn, there was no need to have a hearing. Keppler stated that the counselors would not state that Barnes was a threat to safety. Gaskins stated that there had to be evidence of a threat. Gaskins then asked: "Do we act on the administrative withdrawal?" At that point, either Gaskins or Zaccari explained that "an administrative withdrawal would contain requirements or conditions, one of which could be a re-evaluation [of Barnes] in three to four months from now based on information obtained over the summer." Morgan responded that Barnes would have to follow the instructions given to him by the counseling center.

Keppler interjected that they should "go the route" of Barnes's grade point average, apparently referring to withdrawal on an academic basis. Tanner responded that Barnes had told her he was not going to fail his classes that semester. Zaccari stated that he would meet with Gaskins on Monday to determine the conditions that would allow Barnes readmission to VSU after having been administratively withdrawn. Gaskins stated that "it is not 'if' but 'when' will [Barnes] sue over this." Gaskins also stated that "an emergency withdrawal must rest on mental health with a clear and present danger."

It was then discussed whether the withdrawal letter should be delivered by certified mail, campus police, or the department. It was decided that because the

letter was coming from the President's office, it should be delivered by that department.

On May 7, at Zaccari's request, Gaskins drafted the letter to administratively withdraw Barnes. Gaskins attached a memo to Zaccari, explaining that Barnes was entitled to notice and a hearing. That same day, the letter was delivered to Barnes's dorm room, and it informed Barnes that "[a]s a result of recent activities directed towards me by you, included but not limited to the attached threatening document, you are considered to present a clear and present danger to this campus." The attached document was the above-mentioned collage posted by Barnes on Facebook. The letter provided that Barnes was administratively withdrawn from VSU effective that day. He was not afforded a hearing. However, Barnes was given 48 hours to vacate the residence hall. The letter further explained that Barnes could be readmitted if he submitted: (1) correspondence from a psychiatrist outside of VSU that found he was not a danger to himself and others; and (2) documentation from a mental health professional stating that he would receive on-going therapy while at VSU.

Barnes appealed to the Board of Regents, and in support of his appeal, he attached, among other things, a letter written by McMillan and a letter written by Dr. Kevin Winders, his psychiatrist in Savannah, Georgia. McMillan's letter stated that in her professional opinion as Barnes's counselor, he was not a threat—

indirectly or directly—to anyone on campus.[2]  McMillan's letter also provided that if Barnes returned to VSU, she would continue seeing him in the counseling center. Dr. Winders's letter to the Board stated that he did not think that Barnes was violent or a threat to campus.

The Board requested a response from Zaccari regarding Barnes's administrative withdrawal.  Zaccari drafted a response for the Board, and Gaskins assisted him in editing the letter, which was sent on June 21.  On January 17, 2008, the Board set aside Barnes's administrative withdrawal without comment.

Meanwhile, on January 9, 2008, Barnes brought suit in the Northern District of Georgia against Zaccari, VSU, VSU's Board of Regents, McMillan, Gaskins, Keppler, Mast, and Morgan.  The suit alleged, among other things, violations of procedural and substantive due process, retaliation for exercising his right to free speech under the First Amendment, and breach of contract.  Barnes voluntarily dismissed one defendant, Morgan, prior to the filing of summary judgment motions.  The district court granted summary judgment in favor of Barnes on his claim of a violation of procedural due process against Zaccari because Zaccari did not afford Barnes a pre-withdrawal notice of the charges against him or a hearing. *Barnes v. Zaccari,* 757 F.Supp.2d 1313, 1337–38 (N.D. Ga. 2010).  The district

---

[2]  During his deposition, Zaccari described McMillan as an "integral part of investigating" Barnes.  Zaccari testified that he was "surprised" by the letter and "felt a little bit blind-sided" by it.

court also granted Barnes summary judgment against the Board of Regents on his breach-of-contract claim. *Id.* at 1338.[3]  The district court granted summary judgment in favor of the Defendants on the remaining claims, including Barnes's claim of retaliation for exercising his right to free speech under the First Amendment. *Id.* at 1326–38.

Zaccari and the Board of Regents filed an interlocutory appeal to this Court with respect to whether Zaccari was entitled to qualified immunity and whether the Board of Regents was entitled to Eleventh Amendment immunity. *Barnes v. Zaccari*, 669 F.3d 1295, 1298 (11th Cir. 2012).[4]  This Court held that Zaccari was not entitled to qualified immunity because it was clearly established that although Barnes "was due some predeprivation process," he received none. *Id.* at 1308. However, this Court explained that the issue of whether Zaccari was entitled to qualified immunity did "not drop out of the case." *Id.*  The Court further explained that the district court could "use a special verdict or written interrogatories to determine any disputed facts and the reasonable inferences drawn from those facts." *Id.*  After resolution of the factual issues, Zaccari could raise his defense of qualified immunity in a motion for judgment as a matter of law. *Id.*  With respect

---

[3]  The court found that VSU was an improper party to the lawsuit. *Barnes,* 757 F.Supp.2d at 1334.  The Board of Regents was the proper party to name as a defendant in the lawsuit. *Id.*

[4]  Barnes filed a cross appeal, and this Court held that it did not have jurisdiction over those claims because the district court had not yet entered final judgment. *Barnes*, 669 F.3d at 1302 n.6.

to the breach-of-contract claim, this Court reversed the district court, holding that Georgia had not waived its sovereign immunity and thus, the district court did not have jurisdiction to reach the breach-of-contract claim against the Board of Regents. *Id.* at 1308–09. The case was remanded to the district court with instructions to (1) dismiss the claim against the Board of Regents, and (2) proceed to trial on the issue of damages as to the procedural due process violation. *Id.* On remand, Zaccari filed a motion to transfer, and the case was transferred from the Northern District of Georgia to the Middle District of Georgia.

The district court divided the jury trial on the issue of damages into three phases. The first phase of trial involved the amount of damages. The second phase was to determine punitive damages, if necessary, and the third phase of trial was to resolve any outstanding evidentiary disputes regarding qualified immunity. A jury determined that Barnes was entitled to $50,000 in damages stemming from the violation of his procedural due process rights. The jury also determined that punitive damages were not warranted, rendering the second phase of trial unnecessary. The parties waived a jury trial with respect to the third phase, and the district court, acting as the fact-finder, found that "Zaccari has not been able to demonstrate a factual basis for his claim that there was an emergency situation." Order at 24 (July 24, 2013) (citing *Goss v. Lopez,* 419 U.S. 565, 582–83 (1975)).

13

Thus, the court ruled that Zaccari was not entitled to qualified immunity as a matter of law with respect to Barnes's claim of a procedural due process violation.

The district court awarded Barnes $407,242 in attorney's fees based on the successful prosecution of his claim of a procedural due process violation against Zaccari. Additionally, because the court ruled that Barnes's claims against McMillan, Gaskins, VSU, Keppler, Mast, and Morgan were frivolous, the court awarded those defendants $396,224.50 in attorney's fees.

Barnes now appeals the district court's grant of summary judgment with respect to (1) his retaliation claim against Zaccari, (2) the amount of attorney's fees awarded to him as the prevailing plaintiff, and (3) the award of attorney's fees to the Defendants. We hold that the district court erred in granting summary judgment in favor of Zaccari on the retaliation claim and therefore vacate and remand that claim to the district court. We also vacate and remand the judgment awarding attorney's fees to Barnes. We reverse the award of attorney's fees to McMillan, Keppler, Mast, and Gaskins. We vacate and remand the award of attorney's fees to Morgan and VSU for recalculation.

## II.    FIRST AMENDMENT RETALIATION CLAIM

Barnes argues that the district court erred in granting summary judgment in favor of Zaccari with respect to his First Amendment retaliation claim. This Court reviews a district court's grant of summary judgment *de novo* and views the evidence in the light most favorable to the non-moving party. *Castle v. Appalachian Technical Coll.*, 631 F.3d 1194, 1197 n.2 (11th Cir. 2011).

### A. Individual Claim of Retaliation

This Court has explained that to state a claim for retaliation, the plaintiff "must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). In his complaint before the district court, Barnes asserted that Zaccari retaliated against him by having him withdrawn from VSU for exercising his free speech rights under the First Amendment.[5] The district court specifically noted that the complaint did not "contain a stand alone claim for retaliation against Zaccari." *Barnes*, 757 F.Supp.2d at 1333 n.28. Instead, the district court construed Barnes's retaliation claim as raising only a conspiracy claim. The court concluded that there was "an absence of evidence to support a finding that Zaccari made an

---

[5] In Barnes's notice of appeal, he only sought review of the denial of his First Amendment retaliation claim against Zaccari. Barnes does not appeal the district court's grant of summary judgment in favor of the remaining Defendants on his retaliation claim.

15

agreement with anyone else to retaliate against Barnes for exercising his freedom of speech rights." *Id.* at 1333. More specifically, the court found that the "undisputed facts show that Zaccari alone made the decision to administratively withdraw Barnes from VSU." *Id.* at 1325. The court concluded that "Zaccari did not participate in any sort of conspiracy because no one would agree with [his] decision to withdraw Barnes." *Id.* at 1333. Accordingly, the court granted summary judgment in favor of Zaccari on the retaliation claim. We note that the court did not expressly reach the question of whether Zaccari retaliated against Barnes for exercising his free speech rights under the First Amendment. Instead, it held that there was no showing that Zaccari *conspired* with the other Defendants to retaliate against Barnes.

On appeal, Barnes argues that the district court erred in ruling that Count 3 of his complaint did not raise an individual retaliation claim against Zaccari. We must therefore determine whether Barnes's complaint raised an individual retaliation claim (as opposed to only raising a claim of conspiring to retaliate) against Zaccari. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must give the defendants fair notice of the bases for relief and the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

Count 3 of the complaint is entitled "42 U.S.C. § 1983:  Individual Liability

Free Speech Clause Violation (Individual Defendants in Personal Capacity)."

Complaint at 25.  Although not dispositive, we note that the title of the claim did

not refer to a conspiracy.  In fact, the text of Count 3 had only one reference to a

conspiracy, alleging that the "Defendants' actions in conspiring to expel Barnes

from VSU were taken in retaliation for Barnes's exercise of his First Amendment

freedoms."  However, simply alleging a conspiracy is not enough to sufficiently

plead a claim of conspiracy.  *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice.").  In any event, we need not determine

whether a conspiracy claim was adequately pleaded, because we are convinced that

the complaint sufficiently pleaded a claim for individual retaliation against Zaccari.

The complaint contains several factual allegations that support an individual

claim against Zaccari for retaliating against Barnes for exercising his First

Amendment rights.  *See*, *e.g*., Complaint at 10 ("Barnes was informed by

classmates involved with a campus environmental advocacy organization  . . . that

President Zaccari was upset with Barnes's speech activities and had contacted the

group to express his displeasure, particularly with the fliers"); *id.* at 12 ("Zaccari

told Barnes that Barnes's speech activities had embarrassed him"); *id.* at 13

(alleging that Zaccari met with VSU officials and faculty and "expressed

substantial anger towards Barnes, especially regarding the fliers that previously were posted around campus"); *id.* ("Zaccari then decided to use the Facebook posting, along with his awareness that Barnes had availed himself of campus counseling services, to concoct a claim, in retaliation for Barnes's speech activities questioning his parking garage plans, that Barnes represented some kind of danger");[6] *id.* at 26 (Zaccari's "stated reasons for expelling Barnes from VSU were pretextual and had no rational basis, being wholly contradicted by the views of mental health professionals, communicated to [Zaccari], that Barnes posed no threat to self or others at any time").

Further, the record demonstrates that Zaccari received fair notice of Barnes's individual retaliation claim against him because Zaccari's briefing with respect to the motion to dismiss and the motion for summary judgment did not even mention a conspiracy claim. *See Erickson v. Pardus*, 551 U.S. at 93 (explaining that a defendant must receive fair notice of the bases for relief and the grounds upon which the claim rests). In sum, we conclude that the district court erred in reading the complaint too narrowly when it ruled that there was no "stand-alone" or individual retaliation claim against Zaccari. We therefore vacate the grant of summary judgment as to Barnes's individual retaliation claim against Zaccari and

---

[6] As noted by the district court, Barnes had "created a satirical collage protesting the [parking garage], which he posted on his Facebook website." *Barnes*, 757 F. Supp. 2d at 1317; *see id.* at 1317 n.6.

18

remand it to the district court to address in the first instance.  *Cf. Branscomb v. Sec'y of the Navy*, 461 F. App'x 901, 906 (11th Cir. 2012) (per curiam) (remanding a retaliation claim to the district court to allow it to address the claim in the first instance).

### B.  Qualified Immunity as to First Amendment Retaliation Claim

Zaccari argues that he is entitled to the defense of qualified immunity because he withdrew Barnes from VSU based on Barnes's threatening behavior and perceived mental instability, and not because of Barnes's speech activities. The district court never addressed whether Zaccari was entitled to qualified immunity with respect to the First Amendment retaliation claim because it ruled that Barnes's complaint had not raised an individual claim of retaliation against Zaccari.[7]  As set forth above, we are vacating and remanding the summary judgment on this First Amendment retaliation claim.  Thus, on remand, the district court will have the opportunity to address whether Zaccari is entitled to qualified immunity on the retaliation claim.  *See Hart v. Hodges*, 587 F.3d 1288, 1300 (11th

---

[7] However, the district court did address the issue of whether Zaccari was entitled to qualified immunity with respect to the due process claim, which is not before this Court on appeal.  With respect to that issue, the parties had waived a jury trial and therefore, the district court, acting as the fact-finder, held that "as a matter of fact, Zaccari could not, and did not, reasonably believe there was an emergency on the campus of VSU during spring 2007."  Order at 23 (July 24, 2013).  Based on that factual finding, the court held that Zaccari had no defense for violating Barnes's due process rights by failing to give him a predeprivation hearing.  The district court therefore denied qualified immunity as to the due process claim.  However, the district court did not address whether Zaccari was entitled to qualified immunity with respect to the retaliation claim, which has different elements from a due process claim.

Cir. 2009) (explaining that because the issue of qualified immunity was not decided in the district court, the Court would remand it to allow the district court to decide it in the first instance).

### III.    ATTORNEY'S FEES

#### A. Attorney's Fees Award to Barnes

Barnes contends that the district court erroneously discounted the attorney's fees awarded to him as a prevailing plaintiff against Zaccari.  In light of our holding that the district court erred in granting summary judgment against Barnes and in favor of Zaccari on the retaliation claim, we are remanding the claim to the district court.  Accordingly, the attorney's fee award to Barnes will have to be recalculated once the retaliation claim is resolved.  Nonetheless, in the interest of efficiency, we provide some guidance by addressing Barnes's arguments to the extent they may be relevant on remand.  *See ACLU of Ga. v. Barnes*, 168 F.3d 423, 438 (11th Cir. 1999) (providing guidance for the recalculation of fees on remand).

The applicable statute, 42 U.S.C. § 1988, allows a district court to award attorney's fees to the prevailing party in civil rights cases brought under § 1983. The Supreme Court has explained that when a plaintiff succeeds in bringing a civil rights claim, "he serves as a private attorney general, vindicating a policy that Congress considered of the highest priority."  *Fox v. Vice,* 131 S. Ct. 2205, 2213 (2011) (internal quotation marks and citation omitted).  Thus, a successful civil

rights plaintiff "'should ordinarily recover an attorney's fee' from the defendant—the party whose misconduct created the need for legal action." *Id.* (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416 (1978)).

We review a district court's decision to award attorneys' fees for abuse of discretion. *Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 904 (11th Cir. 2003) (42 U.S.C. § 1988).  The question of whether a district court used the proper standard to award fees is a question of law we review *de novo*, and factual findings related to that question are reviewed for clear error. *Id.*

The district court found that Barnes was a "prevailing plaintiff based on his success with his procedural due process claim against Zaccari."  Order at 50 (July 24, 2013).  The district court applied the lodestar approach in determining the award of attorney's fees.[8]  Additionally, the district court rejected Barnes's counsel's contention that Washington, D.C. was the relevant community for purposes of calculating fees.  Instead, the court ruled that Atlanta was the relevant market.  The court then ordered Barnes's counsel to supplement their original fee motion with evidence regarding appropriate billing rates in Atlanta.  After counsel submitted evidence regarding the range of rates in Atlanta, the district court found

---

[8] "In setting a reasonable attorney's fee, a district court is required to utilize the 'lodestar approach,' which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Gray v. Bostic*, 625 F.3d 692, 714 (11th Cir. 2010).  "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Id.* at 714–15 (internal quotation marks and citation omitted).

21

that, based on its "own knowledge and experience," the rates claimed by counsel were excessive and reduced the rates. *Id.* at 52.

### 1. Hourly Rate

Barnes contends that the district court erred in imposing a maximum hourly rate of $315 because the court ignored record evidence submitted in support of the higher rates. Barnes's attorneys had requested between $300 and $630 per hour, depending upon each attorney's level of experience. Barnes, as the prevailing plaintiff, had the burden of establishing the claimed market rate. *Dillard v. City of Greensboro,* 213 F.3d 1347, 1354 (11th Cir. 2000). The determination of a reasonable hourly rate is a factual finding, which we review for clear error. *Id.* Here, the court itself requested additional evidence from Barnes's counsel regarding the hourly rate in Atlanta and specifically referred to that evidence in its ruling. Thus, we do not agree that the court ignored the record evidence. As set forth above, the court expressly relied upon its "own knowledge and experience." *Id.* A district court is entitled to rely on its own experience and judgment in determining a reasonable hourly rate. *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).

### 2. Excessive Across-the-Board Reduction of Hours

Barnes also contends that the district court erred by imposing an excessive across-the-board reduction of hours. The district court found that the number of

22

hours claimed by Barnes's counsel was "appropriate" and that counsel "exercised appropriate billing judgment in the hours submitted to the Court. [Counsel] cut down the hours for which they seek fees from a raw number of 5,818.30 hours to 3,707.30 hours." Order at 53 (July 24, 2013) (citations omitted). Based on the submitted hours, the lodestar calculation was $1,012,587.25 in attorney's fees.

However, the district court found that the amount of attorney's fees under the lodestar approach was excessive. One of the reasons that the district court found the amount of fees excessive was that Barnes only succeeded on the one claim of a procedural due process violation. As set forth previously, we are remanding to the district court to allow it to address the claim of retaliation. Because of these changed circumstances, the district court will have to recalculate the plaintiff's attorney's fee award after it addresses the retaliation claim on remand.

Nonetheless, we note that Barnes's counsel asserts that they reduced the number of hours submitted to the court in part because of the unsuccessful claims. The district court's across-the-board reduction was also based in part on the unsuccessful claims. On remand, the district court must take care not to doubly discount the hours based on the same consideration. *Cf. Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1352 (11th Cir. 2008) (explaining that if a factor is considered in

23

determining the lodestar figure, it should not be reconsidered to further adjust the lodestar because "doing so amounts to double-counting").

## B.   Attorney's Fees Award to Defendants

Barnes also contends that the district court erred in awarding attorney's fees to the following Defendants: McMillan, Keppler, Mast, Gaskins, Morgan, and VSU.[9]  As set forth above, a prevailing plaintiff should generally receive attorney's fees from the defendant in order to reimburse a plaintiff for what it cost him to vindicate his civil rights.  *Fox*, 131 S. Ct. at 2213.  On the other hand, with respect to a prevailing *defendant*, there is a different standard that reflects the very different equitable considerations at stake.  *Id.*  In 42 U.S.C. § 1988, Congress intended "to protect defendants from burdensome litigation having no legal or factual basis."  *Id.* (internal quotations marks and citation omitted).  Thus, a district court may award attorney's fees to a prevailing *defendant* in a § 1983 action if the plaintiff's claim was "frivolous, unreasonable, or without foundation."  *Id.*; *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1188 (11th Cir. 1985).

> With respect to determining whether a claim is frivolous, the Supreme Court has cautioned:[I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.  This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

---

[9] Barnes does not appeal the summary judgment in the Defendants' favor on the merits of the claims against them.  *See supra* note 5.

*Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421–22 (1980). Instead, when determining whether a suit is frivolous, "a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Sullivan*, 773 F.2d at 1189 (internal quotation marks and citation omitted). A district court's finding of frivolity has been upheld in cases in which a plaintiff fails to introduce any evidence in support of his claim. *Id.* (citing *Beard v. Annis*, 730 F.2d 741 (11th Cir. 1984); *Jones v. Dealers Tractor and Equip. Co.*, 634 F.2d 180 (5th Cir. 1981); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272 (5th Cir. 1981); *Harris v. Plastics Mfg. Co.*, 617 F.2d 438 (5th Cir. 1980)). In contrast, "[i]n cases where the plaintiffs introduced evidence sufficient to support their claims, findings of frivolity typically do not stand." *Id.* (citing *White v. S. Park Indep. Sch. Dist.*, 693 F.2d 1163 (5th Cir. 1982); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127 (5th Cir. 1983)).

In addition, the following factors are considered when determining whether a claim is frivolous: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Id.* However, these factors are "general guidelines only, not hard and fast rules." *Id.* In § 1988 cases, the Eleventh Circuit has provided an additional factor: the attention given to the

25

claim. A "claim is not frivolous when it is 'meritorious enough to receive careful attention and review.'" *Cohen v. World Omni Fin. Corp.*, 457 F. App'x 822, 828 (11th Cir. 2012) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 787 (11th Cir. 1991)). "Determinations regarding frivolity are to be made on a case-by-case basis." *Sullivan*, 773 F.2d at 1189.

### 1. District Court Rulings

With respect to the first factor, the district court held that Barnes failed to establish a prima facie case as to all six Defendants. With respect to the second factor, the court recognized that VSU had offered a $5,000 to settle all claims as to all Defendants.[10] Nonetheless, the court opined that that offer "can hardly be considered a serious settlement negotiation, considering that Barnes asserted damages for millions of dollars." Order at 35 (July 24, 2013). As for the third factor, none of the claims against these six Defendants went to trial. In considering the fourth factor, the district court stated that there "is no doubt that this case has been the subject of much judicial attention in the well over five years that it has been pending in federal court." Order at 27 (July 24, 2013). However, the court concluded that as to these six Defendants, the level of attention afforded the claims against them did not rise to a level of extended review that would render them non-frivolous.

---

[10] Gaskins and McMillan state that they never engaged in settlement negotiations.

26

## 2. Standard of Review

Accordingly, we must now determine whether the district court erred in ruling that Barnes's claims were frivolous. The parties agree that we review the determination of whether the claims were frivolous for abuse of discretion. *See Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1179 (11th Cir. 2005) (reviewing ruling that plaintiff's claims under the Americans with Disabilities Act were frivolous for abuse of discretion); *Bonner v. Mobile Energy Servs. Co.*, 246 F.3d 1303, 1304 (11th Cir. 2001) (same standard of review in Title VII case). Of course, a "'district court by definition abuses its discretion when it makes an error of law.'" *Quintana v. Jenne*, 414 F.3d 1306, 1309 (11th Cir. 2005) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

In determining whether a claim is frivolous, "we view the evidence in the light most favorable to the *non*-prevailing plaintiff." *Cordoba*, 419 F.3d at 1179 (emphasis in original). Thus, we view the evidence in the light most favorable to Barnes with respect to each Defendant in determining whether Barnes's claims against them were frivolous.

As set forth below, we are persuaded that the evidence against the six Defendants establishes that Barnes's claims against them were not frivolous. *Cf. id.* at 1181 (explaining that although the plaintiff's "case was exceedingly weak on this point, it was not so weak as to make it frivolous for her to argue that [her

27

supervisor's] knowledge of her disability presented a triable issue of fact").  The

factors regarding frivolity are general guidelines only and not hard and fast rules.

*Sullivan*, 773 F.3d at 1189.[11]  Our precedent dictates that "[d]eterminations

regarding frivolity are to be made on a case-by-case basis."  *Id.*  As explained

below, we conclude that the district court erred as a matter of law by failing to

view the evidence in the light most favorable to Barnes.  When the evidence

against the Defendants is viewed in the proper light, we conclude that the claims

are not without foundation.  In other words, it was not unreasonable for Barnes to

believe that the Defendants participated in his withdrawal from VSU.  *Cf. Bruce v.

City of Gainesville, Ga.*, 177 F.3d 949, 952 (11th Cir. 1999) (finding that the

plaintiff's belief that he was terminated because of his disability was not

unreasonable even though plaintiff did not "provide enough evidence to support

denial of the [defendant's] summary judgment motion").  Thus, as explained

below, we conclude that the district court abused its discretion in awarding

attorney's fees to four of the six Defendants.

### 3.  Frivolousness

---

[11] The other factors—(1) settlement offer (2) dismissal prior to trial and (3) level of attention afforded the claims—do not merit much discussion here.  We are not persuaded that the $5,000 offer did not constitute a settlement offer, as the district court found.  As for the second factor, it is undisputed that all these Defendants were dismissed prior to trial.  In any event, even assuming these factors weighed in favor of the Defendants, we are convinced that the evidence proffered against the Defendants precludes finding that the claims against them are frivolous.

With respect to a claim of First Amendment retaliation, a plaintiff must show that he engaged in constitutionally protected conduct and that that "conduct played a 'substantial or motivating role' in the alleged adverse employment action." *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1289 (11th Cir. 2012).  To establish a claim alleging denial of procedural due process, a plaintiff must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).  "[A]t a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of . . . property at the hands of the government."  *Id*. (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).As previously set forth, we are remanding the retaliation claim against Zaccari to the district court, and the retaliation claims against the other Defendants are not before us.  The district court found in favor of Barnes on the procedural due process claim and that is not before us on appeal.[12]  To assess whether it was frivolous to bring these

---

[12] It is undisputed that Barnes did not receive notice of the charge against him prior to the withdrawal or any kind of a hearing to address the charge.  Indeed, the district court held that "[t]here was never any question but that [Zaccari] [withdrew] Plaintiff Barnes from Valdosta State University and denied Barnes due process."  Zaccari's defense was that because Barnes was a clear and present danger, the emergency excused giving Barnes notice and a hearing.  The district court, acting as fact-finder, ruled that "Zaccari could not, and did not, reasonably believe there was an emergency on the campus of VSU during spring 2007."  Accordingly, there is no question that Zaccari violated Barnes's procedural due process rights in withdrawing Barnes from VSU without notice and a hearing.

claims against these six Defendants, we now consider evidence offered by Barnes against each Defendant.

### a. McMillan (Barnes's Therapist)

Zaccari testified that McMillan was an integral part of his investigation of Barnes. In her deposition, McMillan testified that she had believed that Barnes would benefit from taking off the summer semester in 2007. In Zaccari's affidavit, he stated that he "was aware of the concerns of [Barnes's] therapists that he was decompensating and could have benefitted from a semester off." There was evidence that McMillan, in her role as Barnes's therapist at VSU, shared Barnes's confidential information with Zaccari without obtaining permission from Barnes. Viewing this evidence in the light most favorable to Barnes, McMillan's conduct can reasonably be interpreted as assisting Zaccari in his efforts to have Barnes withdrawn and/or to punish Barnes for exercising his right to free speech. This conduct can be construed as a retaliatory act against Barnes. Although McMillan states that she repeatedly told Zaccari that Barnes did not constitute a threat to security, Zaccari testified that McMillan did not do so. Indeed, Zaccari testified that the first time he was aware of McMillan's opinion that Barnes did not constitute a threat was after the withdrawal letter was delivered to Barnes. Based on this evidence, we conclude that it was not unreasonable for Barnes to believe that McMillan participated in having Barnes withdrawn. This evidence

demonstrates that Barnes's claims against McMillan were not frivolous, unreasonable, or without foundation. Thus, we reverse the district court's judgment awarding attorney's fees to McMillan.

### b. Keppler (Vice President of Student Affairs)

In determining that Keppler was entitled to attorney's fees, the district court relied upon Keppler's testimony that he had nothing to do with Zaccari's "final decision" to withdraw Barnes from VSU. Order at 41 (July 24, 2013). However, the district court ignored testimony that implicated Keppler in the decision to withdraw. There were notes from a meeting attended by Keppler and Zaccari that indicated that Keppler supported attempting to withdraw Barnes from VSU on an academic basis. Further, in Zaccari's June 21, 2007, letter to VSU's Board of Regents, he stated that to determine what actions should be taken with respect to Barnes, he "sought the advice" of members of his administrative unit, which included Keppler. The letter provided that Zaccari and his administrative unit "collectively decided that VSU [should] take necessary steps to minimize as much as possible any security risks." Similarly, Zaccari testified that at a meeting on April 26, 2007, which included Keppler, "there was agreement from the group for us to initiate the plan that [he had] outlined." Zaccari further testified that no one at the meeting expressed disagreement with him. Viewing this evidence in the light most favorable to Barnes, we conclude that it was not unreasonable for

Barnes to believe that Keppler participated in having Barnes withdrawn. Barnes's claims against McMillan were not frivolous, unreasonable, or without foundation. Therefore, we reverse the district court's judgment awarding attorney's fees to Keppler.

### c.  Mast (Dean of Students)

The district court awarded attorney's fees to Mast, stating that Barnes primarily relied upon "Mast's alleged lack of action and his omissions as opposed to any affirmative action." Order at 41 (July 24, 2013). The court further stated that Mast attended meetings that were called to discuss Barnes, "but Mast agreed with Keppler that Zaccari's response was an overreaction." *Id.* After reviewing the record, we are persuaded that the district court did not view the evidence in the light most favorable to Barnes. We note that although Mast may not have interpreted Barnes's conduct as threatening, he testified at his deposition that he did not inform Zaccari of his opinion. Additionally, Zaccari's letter to the Board of Regents states that "Mast provided a copy of a document generated by Mr. Barnes, wherein he had posted my picture on an image of a parking deck with the words, 'S.A.V.E. – Zaccari Memorial Parking Deck.'" It would not be unreasonable for Barnes to construe Mast's giving this document to Zaccari as assistance in building a case to withdraw Barnes. Moreover, the record contains notes from a meeting indicating that Mast suggested that Barnes's "veiled threat"

could be used as a basis for withdrawal for disorderly conduct.   Again, we note that although Mast testified that he did not give Zaccari the above-referenced image generated by Barnes and that he did not remember suggesting a basis for Barnes's withdrawal during the meeting, we must look at the evidence in the light most favorable to Barnes.  In that light, we cannot say that Barnes's suit against Mast was frivolous, unreasonable, or without foundation.  We therefore reverse the district court's judgment awarding attorney's fees to Mast.

### d.  Gaskins (VSU In-House Counsel)

Gaskins met with Zaccari on April 26, 2007, to discuss possible avenues for withdrawing Barnes from VSU.  In her deposition, Gaskins admitted that she researched different VSU policies that could possibly be used to withdraw Barnes, and that she provided the results of that research to Zaccari.  Gaskins also attended the May 3 meeting with Zaccari and other staff members in which Zaccari announced his decision to administratively withdraw Barnes.  With respect to that meeting, this Court's opinion in the instant case's interlocutory appeal provided that Zaccari "did not ask those present [at the meeting] if he was making the right decision, and no one told him he was." *Barnes*, 669 F.3d at 1301.  Nonetheless, viewing the evidence in the light most favorable to Barnes, we stated,

"Collectively though, the group agreed that Barnes should be withdrawn on May 7, a full four days later." *Id.*[13]

At Zaccari's request, Gaskins drafted the letter that withdrew Barnes from VSU.  On appeal, Gaskins relies heavily on the fact that she advised Zaccari in an attached memorandum that Barnes was entitled to a hearing.  Although this evidence indicates that Gaskins did not participate in violating Barnes's due process rights, it does not mean that she had no involvement in assisting Zaccari in having Barnes withdrawn in retaliation for exercising his First Amendment rights.  During his deposition, Mast testified that Zaccari said that he made the decision to withdraw Barnes from VSU "based on advice of counsel, University counsel, and Board of Regents' attorney."  Additionally, after Barnes was withdrawn, the Board of Regents directed Zaccari to respond to Barnes's request for a review of the withdrawal.  Zaccari asked Gaskins to review the response he had drafted so that he could fully explain why he made the decision to withdraw Barnes.  Gaskins testified that the draft response Zaccari gave her was in "very, very rough form," and that she recommended modifications to the document.

Viewing the evidence in the light most favorable to Barnes, Gaskins: (1) researched VSU policies that could be used to withdraw Barnes; (2) drafted the

---

[13] However, we note that Zaccari's letter to the Board of Regents did not name Gaskins as part of his administrative unit that "collectively decided that VSU take necessary steps to minimize as much as possible any security risks."  Zaccari's letter never mentions Gaskins.

34

withdrawal letter that she knew would violate Barnes's due process rights if signed by Zaccari and delivered to Barnes without notice and a hearing; and (3) assisted Zaccari in defending his actions to the Board of Regents.  Under these circumstances, it was not unreasonable for Barnes to believe that Gaskins participated in his withdrawal from VSU.  We are thus unconvinced that Barnes's claims against Gaskins were frivolous, unreasonable, or without foundation.

### e.  VSU and Morgan (Counseling Center Director)

Barnes's brief does not specifically challenge the district court's ruling that his claims against Morgan and VSU were frivolous.  Thus, Barnes has abandoned any challenge to the judgment awarding those attorney's fees.  *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).  Nonetheless, because the district court awarded the attorney's fees in a lump sum to VSU, Keppler, Mast, and Morgan, and did not distinguish the amount of attorney's fees awarded as to each Defendant, we must remand to allow the district court to recalculate the attorney's fees award to reflect only "reasonable attorney's fees incurred because of, but only because of, frivolous claim[s]" against Morgan and VSU.  *Fox*, 131 S. Ct. at 2215.

In sum, because there was evidence showing that each of the first four Defendants took part in the decision to withdraw Barnes, the district court erred in finding that the claims were frivolous.  *Compare Richardson v. Bay Dist. Sch.*, 560 F. App'x 928, 930 (11th Cir. 2014) (explaining that "[j]ust because this evidence

35

was ultimately not enough to create a jury question with respect to discrimination on the basis of gender discrimination does not make [the plaintiff's] claim frivolous"), *with Cazares*, 638 F.2d at 1290 (upholding award of attorney's fees because "there was no material, admissible evidence to support [the plaintiff's] civil rights claim").  We therefore hold that the district court abused its discretion in ruling that Barnes's claims against McMillan, Keppler, Mast, and Gaskins were frivolous, and we reverse the court's judgment awarding attorney's fees to those Defendants.  With respect to the fees awarded to Morgan and VSU, we vacate the judgment awarding those fees and remand to allow the district court to recalculate the attorney's fees award to reflect only the attorney's fees incurred because of the frivolous claims against Morgan and VSU.

IV.    CONCLUSION

For the foregoing reasons, we vacate and remand the grant of summary judgment with respect to the retaliation claim against Zaccari, and we vacate and remand the judgment awarding attorney's fees to Barnes.  We reverse the award of attorney's fees to McMillan, Keppler, Mast, and Gaskins.  Finally, we vacate and remand the award of attorney's fees to Morgan and VSU.

**VACATED AND REMANDED.**